UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

IONIAN RE, LLC, SKYLINE RESTORATION INC.,
URBAN D.C. INC. and DNA CONTRACTING &
WATERPROOFING LLC,

Case: _____

Plaintiffs,

v.

PATRICIO CEDILLO a/k/a PATRICIO FROILAN
CEDILLO; CARLOS FIGUEROA-ORELLANA;
ROSARIO GUILLERMINA CEDILLO a/k/a
ROSARIO CEDILLO; ERIK M. BARREZUETA
ORELLANA a/k/a ERIK MICHAEL BARREZUETA
ORELLANA; WILSON BARREZUETA; FREDDY
FAJARDO a/k/a FREDDY ALEXANDER FAJARDO
LANDIVAR; RONALD EFRAIN BRAVO a/k/a
RONALD EFRAIN BRAVO ORELLANA;
CRISTHIAN ORLANDO MONTESDEOCA
PERALTA; MIGUEL ANGEL TELEGUARIO TZAY;
ERWIN MARCELO GUARANGO-MARIN; MILTON
JAVIER GUARANGO-MARIN; JOHNNY
GEOVANNY CLAVIJOS FAJARDO; HERBERT S.
SUBIN; ERIC D. SUBIN; SUBIN & ASSOCIATES,
LLC; WINGATE, RUSSOTTI, SHAPIRO, MOSES &
HALPERIN, LLP; PHILIP RUSSOTTI; CLIFFORD H.
SHAPIRO; KENNETH HALPERIN; I. BRYCE
MOSES; WILLIAM SCHWITZER & ASSOCIATES,
P.C.; WILLIAM SCHWITZER; and JOHN DOES "1-
50",

Defendants.

---

ORIGINAL COMPLAINT

---

NOW COMES PLAINTIFFS IONIAN RE, LLC, SKYLINE RESTORATION INC.,

URBAN D.C. INC. and DNA CONTRACTING & WATERPROOFING LLC (hereinafter referred

to as "Plaintiffs") by and through their attorneys THE WILLIS LAW GROUP, LLC, allege as follows:

## I.    JURISDICTION AND VENUE

1. This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and many of the Defendants reside in this District.

## II.    THE PARTIES

### A.    Plaintiffs

3. Plaintiff IONIAN RE, LLC (hereinafter "Ionian") is a limited liability company duly organized and existing under the laws of Vermont. At all times relevant herein, Ionian was authorized to conduct business in New York.

4. Plaintiff SKYLINE RESTRATION INC. (hereinafter "Skyline) is a corporation duly organized and existing under the laws of the State of New York. At all times relevant, Skyline was authorized to conduct business in New York.

5. Plaintiff URBAN D.C. INC. (hereinafter "Urban) is a corporation duly organized and existing under the laws of the State of New York. At all times relevant, Urban was authorized to conduct business in New York.

6. Plaintiff DNA CONTRACTING & WATERPROOFING LLC (hereinafter "DNA Contracting & Waterproofing") is a limited liability company duly organized and existing under the laws of the State of New York.  At all times relevant, DNA Contracting & Waterproofing was authorized to conduct business in New York.

**B.**    **Defendants**

7. Upon information and belief, Defendant PATRICIO CEDILLO a/k/a PATRICIO FROILAN CEDILLO ("Patricio Cedillo"), is an individual residing at 38-06 111st Street in the County of Queens, City and State of New York.

8. Upon information and belief, Defendant CARLOS FIGUERO-ORELLANA ("Carlos Figueroa Orellana") is an individual residing at 25-43 85th Street, County of Queens, City and State of New York and/or 86-20 57th Ave., in the County of Queens, City and State of New York.

9. Upon information and belief, Defendant ROSARIO GUILLERMINA CEDILLO a/k/a ROSARIO CEDILLO ("Rosario Cedillo"), is an individual residing at 39-19 108th Street in the County of Queens, City and State of New York.

10. Upon information and belief, Defendant ERIK M. BARREZUETA ORELLANA a/k/a ERIK MICHAEL BARREZUETA ORELLANA ("Barrezueta"), is an individual residing at 53-20 Junction Blvd. in the County of Queens, City and State of New York.

11. Upon information and belief, Defendant WILSON BARREZUETA ("Wilson Barrezueta") is an individual residing at 9-02 129th Street in the County of Queens, City and State of New York.

12. Upon information and belief, Defendant FREDDY FAJARDO a/k/a FREDDY ALEXANDER FAJARDO LANDIVAR ("Fajardo") is an individual residing at 25-43

85th Street and/or 53-20 Junction Blvd. in the County of Queens, City and State of New York.

13. Upon information and belief, Defendant RONALD EFRAIN BRAVO a/k/a RONALD EFRAIN BRAVO ORELLANA ("Bravo") is an individual residing at 31-19 84th Street in the County of Queens, City and State of New York.

14. Upon information and belief, Defendant CRISTHIAN ORLANDO MONTESDEOCA PERALTA ("Montesdeoca") is an individual residing at 130-24 59th Avenue, in the County of Queens, City and State of New York.

15. Upon information and belief, Defendant MIGUEL ANGEL TELEGUARIO TZAY ("Tzay") is an individual residing at 280 Cornelia Street in the County of Brooklyn, City and State of New York.

16. Upon information and belief, Defendant ERWIN MARCELO GUARANGO-MARIN ("Erwin Marin") is an individual residing in the County of Brooklyn, City and State of New York.

17. Upon information and belief, Defendant MILTON JAVIER GUARANGO-MARIN ("Milton Marin") is an individual residing at 35-25 103rd Street in the County of Queens, City and State of New York.

18. Upon information and belief, Defendant JOHNNY GEOVANNY CLAVIJOS FAJARDO ("Clavijos Fajardo") is an individual residing at 333 83rd Street in the County of Kings, City and State of New York.

19. Patricia Cedillo, Carlos Figueroa Orellana, Rosario Cedillo, Barrezueta, Wilson Barrezueta, Fajardo, Bravo, Montesdeoca, Tzay, Erwin Marin, Milton Marin and

Clavijos Fajardo are collectively referred to herein as the "Runner-Claimant Defendants".

20. Defendant SUBIN & ASSOCIATES, LLC ("Subin Firm") is a limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, the Subin Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

21. Upon information and belief, Defendant HERBERT D. SUBIN ("H. Subin") is a citizen of the State of New York. He is the principal, lead trial attorney at the Subin Firm, with an office at 150 Broadway, New York, NY 10038. At all times relevant herein, H. Subin was licensed or otherwise authorized to practice law in the State of New York.

22. Upon information and belief, Defendant ERIC D. SUBIN ("E. Subin") is a citizen of the State of North Carolina and a senior trial attorney at the Subin Firm. At all times relevant herein, E. Subin was licensed or otherwise authorized to practice law in the State of New York.

23. Subin Firm, H. Subin and E. Subin are collectively referred to herein as the "Subin Defendants".

24. Defendant WINGATE, RUSSOTTI, SHAPIRO, MOSES & HALPERIN, LLP ("Wingate Firm") is a limited liability partnership duly organized and existing under the laws of the State of New York. At all times relevant herein, the Wingate Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

25. Upon information and belief, Defendant PHILIP RUSSOTTI ("Russotti") resides in and is a citizen of the State of New York. He is a named partner of Wingate Firm. At

all times relevant herein, Russotti was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

26. Upon information and belief, Defendant CLIFFORD H. SHAPIRO ("Shapiro") resides in and is a citizen of the State of New York. He is a named partner of Wingate Firm. At all times relevant herein, Shapiro was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

27. Upon information and belief, Defendant KENNETH HALPERIN ("Halperin") resides in and is a citizen of the State of New York. He is a named partner of Wingate Firm. At all times relevant herein, Halperin was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

28. Upon information and belief, Defendant I. BRYCE MOSES ("Moses" and together with Russotti, Shapiro and Halperin, the "Wingate Partners") resides in and is a citizen of the State of New York. He is a named partner of Wingate Firm. At all times relevant herein, Moses was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

29. Wingate Partners and Wingate Firm are collectively referred to herein as the "Wingate Defendants".

30. Defendant WILLIAM SCHWITZER & ASSOCIATES, P.C. ("Schwitzer Firm") is a professional corporation duly organized and existing under the laws of the State of New York.  At all times relevant herein, the Schwitzer Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

31. Upon information and belief, Defendant WILLIAM SCHWITZER ("Schwitzer") is a citizen of the State of New York.  He is the founding and senior partner at the Schwitzer Firm, with an office at 820 2nd Avenue, 10th Floor, New York, NY 10017.  At all times relevant herein, Schwitzer was licensed or otherwise authorized to practice law in the State of New York.

32. Schwitzer Firm and Schwitzer are collectively referred to herein as the "Schwitzer Defendants".

33. The Subin Defendants, Wingate Defendants and Schwitzer Defendants are collectively referred to herein as the "Plaintiff Law Firms".

34. The Runner-Claimant Defendants and the Plaintiff Law Firms are collectively referred to herein as the "Defendants".

35. Upon information and belief, in addition to the named Defendants, John Does 1-50 are individuals, medical providers or other persons and entities whose level of participation and/or identities are currently unknown but who, through their actions and omissions, conspired with the named Defendants to violate 18 U.S.C. § 1962 by participating in the affairs of the RICO enterprise through a pattern of racketeering activity as well as violating various related laws.

## III.   FACTUAL BACKGROUND

### A.   Fraud Scheme

36. As alleged herein, this complaint arises from staged construction site accidents occurring in the State of New York, including the twelve alleged accidents demonstrated below which approximately occurred between December 21, 2017, and July 17, 2023.  Such accidents were orchestrated by the Defendants and pursued as fraudulent claims.

37. Since at least 2017 to the present, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud Plaintiffs and others by (i) unlawfully grooming and recruiting construction workers into staging and perpetuating fake construction accidents that occurred in New York; (ii) participating in staging and perpetuating fake construction accidents themselves; (iii) preparing and collecting documentation as well as submitting, filing, prosecuting and asserting fraudulent workers' compensation claims and personal injury lawsuits on behalf of themselves and/or such construction workers; (iv) providing or alleging to have provided medically unnecessary and excessive healthcare services to such construction workers; and/or (v) using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to inflate settlement value of claims (the "Fraud Scheme").

38. The Defendants together constituted an association-in-fact enterprise generally structured as depicted below in Figure 1:

**Figure 1.**



39. Generally, as part of the Fraud Scheme, individuals known as "runners" ("Runners"), under the direction and/or for the benefit of the named Defendants herein recruited construction workers ("Claimants") into staging and/or perpetuating fake construction accidents at various construction sites throughout New York.

40. Regardless of any actual bodily injury stemming from the purported construction accidents, Claimants were instructed by the Runners, under the direction and/or for the benefit of the Defendants, to fake and to claim certain bodily injuries that purportedly resulted from such accidents and to seek medical treatment.

41. The Runners then referred and/or transported Claimants to the Plaintiff Law Firms where attorneys and/or other employees of the Plaintiff Law Firms met with Claimants.

42. The Plaintiff Law Firms represent Claimants in connection with general liability lawsuits filed against various parties involved with the construction project (*e.g.*, owner, general contractor, construction manager, etc.) for purported injuries that resulted from accidents on the construction project.

43. For workers' compensation claims, the Plaintiff Law Firms referred Claimants to certain other complicit law firms ("Other Law Firms"). The Plaintiff Law Firms would receive financial remuneration based on the amount of settlement. The Other Law Firms represented the Claimants before the New York State Workers' Compensation Board.

44. For most Claimants, both general liability lawsuits and workers' compensation claims were initiated and proceeded in parallel to maximize profit for the Defendants and Plaintiff Law Firms.

45. In order to inflate settlement values and workers' compensation benefits, and thereby effectuate higher profits, the Runners and/or Plaintiff Law Firms directed the Claimants to seek medical treatment from associated medical providers ("Medical Providers") who provide a variety of services (radiology, physical therapy, pain management and orthopedic surgery) at facilities located in or to patients from multiple states, including New York and New Jersey.

46. The Medical Providers had an agreement and understanding as to their involvement in the Fraud Scheme, including providing fraudulent medical documentation needed for higher settlement values in exchange the continuation of patients being funneled to their offices and additional monies obtained via predatory litigation funding.

47. The Runner-Claimant Defendants, as demonstrated below, not only participated in the Fraud Scheme as Runners, but also as Claimants themselves with full knowledge and consent between them, their respective Plaintiff Law Firms and Medical Providers to engage in and assert fraudulent accident claims.

48. The Fraud Scheme follows a consistent pattern where a Claimant, including the Runner-Claimant Defendants, would start work at a targeted construction site and, within days or a few weeks, stage an accident. The accident was usually unwitnessed, even when there were numerous people around at the time of accident and then the claimant feigns injury from the accident.

49. Here, the Runner-Claimants would report their alleged injuries to their immediate supervisor and either request an ambulance to be taken to a local hospital or request someone to drive them to the local hospital where diagnostic tests would be taken.

50. In each instance, the Runner-Claimants would: (i) be discharged from the hospital within hours; (ii) retain counsel; (iii) file a workers' compensation claim, sometimes on the very same day of their accident; and, (iv) initiate a personal injury action with inflated damages, sometimes as absurdly high as eight million five hundred thousand dollars in anticipated medical expenses alone. The Runner-Claimants would be referred to medical personnel who would falsely build up alleged injuries in support of bogus multi-million-dollar claims.

51. Their scheme is part of a grand, organized and illegal overall scheme to defraud insurance companies and take advantage of New York's liberal Labor Law worker protections. Upon information and belief, this scheme involves hundreds of fraudulent claimants and has cost and continues to cost the people of New York State hundreds of millions of dollars in increased insurance premiums passed on to the State's real estate owners/developers, constructions managers, general contractors and subcontractors in the form of exorbitant increased premiums.

52. This pervasive fraud prompted the Subin Defendants, upon their conduct being exposed, to file motions to withdraw as counsel in two to three hundred additional cases, including six of the twelve defendant cases herein.

53. By recruiting Claimants and engaging in staged accident themselves, the Runner-Claimants financially benefit off this scheme through referral fees and settlement proceeds associated with the fraudulent claims.

54. By representing Claimants and pursuing settlement on behalf of Claimants, the Plaintiff Law Firms earn a certain percentage of the judgment or settlement as compensation, in addition to other moneys obtained via unnecessary litigation funding. The compensation is filtered through other limited liability companies to ultimately return to the Plaintiff Law Firms and others, to the specific and foreseeable detriment of the Claimants themselves.

55. By referring Claimants to Other Law Firms to pursue workers' compensation benefits, the Plaintiff Law Firms maintain control over treatment allegedly provided while Other Law Firms earn a percentage of the workers' compensation benefit as compensation.

56. The greater the extent and severity of the claimed medical treatment results in greater the workers' compensation benefits and settlement values. Thus, by directing Claimants to receive unnecessary, excessive, unwarranted and costly healthcare services and thereby fraudulently manufacturing medical treatment, Defendants unlawfully inflate workers' compensation benefits and settlement values from which the Defendants, receive financial gain.

**B.** **Fraudulent Accident, Treatment and Claim/Lawsuit in Furtherance of Fraud Scheme**

57. The Defendants knowingly engaged in this Fraud Scheme, filing numerous fraudulent claims and lawsuits, including the following twelve claims.

**STAGED ACCIDENT # 1 – Patricio Cedillo – December 21, 2017**

58. DNA Contracting & Waterproofing is the general contractor hired by the Nautilus Corp., the owner of 2790 Bragg Street in Brooklyn, New York to perform construction related work at said location. DNA Contracting & Waterproofing is a named insured under the Ionian and Liberty Mutual policies.

59. DNA Contracting & Waterproofing subcontracted with Oneteam Restoration Inc. ("Oneteam"), which in turn subcontracted with Patricio Cedillo's employer, Miranda Contracting Corp. ("Miranda"), to perform said construction-related work at 2790 Bragg Street.

60. DNA Contracting & Waterproofing had started working at 2790 Bragg Street on or about June 1, 2017, and was working at the location along with Oneteam and Miranda on December 21, 2017, the date of Patricio Cedillo's staged accident.

61. Defendant Patricio Cedillo began working for Miranda on or about November 21, 2017.

62. On or about December 21, 2017, within one month after he began working for Miranda at 2790 Bragg Street, Patricio Cedillo staged his accident claiming injuries resulting therefrom.  He purposely jumped from a second-story balcony, after which he stood up and walked to the on-site construction office, where he complained of pain in his feet and stomach.

63. The staged accident was witnessed by co-worker Jorge Quezada, who attested that Patricio Cedillo unhooked his safety harness and purposely jumped off the seven-foot-high balcony rather than using the alternative available safe means of descending via the sidewalk shed as Patricio Cedillo had been trained.

64. Patricio Cedillo was then taken by ambulance to a local hospital, at which a series of diagnostic tests were taken. Patricio Cedillo was discharged within hours without significant clinical medical findings of injury.

65. Upon information and belief, despite being discharged from the hospital without any significant findings of disability, Patricio Cedillo's attorneys referred him to medical providers who falsely opined on injuries where none existed or were unrelated to Patricio Cedillo's alleged fall.

66. On or about January 8, 2018, within a few weeks of his accident, Patricio Cedillo and those on his behalf knowingly electronically filed and/or sent, or caused to be sent by mail a workers' compensation claim made under the penalty of perjury wherein he falsely claimed he was employed by DNA Contracting & Waterproofing and falsely alleged a series of injuries caused by his staged accident.

67. On or about February 9, 2018, approximately six weeks after his alleged fall, Patricio Cedillo and the Wingate Firm electronically filed his lawsuit for personal injuries in Queens County Supreme Court captioned *Patricio Cedillo v. Nautilus Realty Limited Partnership, et al,* under Index No. 702077/2018.

68. Patricio Cedillo thereafter changed attorneys to the Subin Firm, which recently moved to be relieved as counsel on or about July 17, 2024.

69. After purposely jumping approximately seven feet from a scaffold bridge, getting up and then walking to the onsite construction office, on or about November 13, 2018, Patricio Cedillo and the Wingate Firm caused to be mailed to defense counsel in the aforesaid litigation a fraudulent verified Bill of Particulars, verified under oath, alleging that he sustained the following injuries:

> **Cervical Spine**:  C6-C7 right paracentral disc herniation impinges upon the thecal sac; C3-C4 bulging disc impinging upon the thecal sac; C5-C6 bulging disc impinging upon the thecal sac; Lower right convex scoliosis with reversal of the upper cervical lordosis; Cervical radiculopathy; Restrictive range of motion with pain; Cervical spine tenderness; Cervical sprain/strain secondary to trauma; Chronic neck pain; Myalgia/Myositis; Cervicalgia; Necessity of future surgery.

> **Lumbar Spine**:  L5-S 1 broad-based left paracentral disc herniation impinging upon the nerve roots within the spinal canal; L5-S 1 broad-based left paracentral disc herniation impinging upon the nerve roots within the spinal canal; LS-S 1 disc bulging disc narrowing the neural foramina bilaterally impinging upon their nerve roots; Lower left cortex scoliosis with straightening of the lumbar lordosis; Lumbar radiculopathy; Sprain/Strain secondary to trauma; Lumbar derangement; Sprain/Strain secondary to trauma; Muscle spasm; Myalgia-Myositis; Lumbalgia; Necessity of future surgery.

> **Left ankle**:  Sprain at the distal posterior tibial tendon, deltoid ligament and talofibular ligaments; Internal derangement.

> **Left shoulder**:  Linear intrasubstance supraspinatus tendon tear at the insertion with surrounding tendinosis; Rotator cuff tendinitis and bursitis; Internal derangement; Sprain/strain secondary trauma.

> **Other**:  Sprain/strain of the left elbow; Traumatic induced pain of the pelvis; Laceration in the falciform ligament; Post-traumatic stress disorder; Anxiety; Swelling; Tenderness; and Limitation of motion involving the skin, bone, cartilage, ligaments, tendons, joints, blood vessels, nervous systems, lymphatic system and other tissues of the affected and surrounding areas.

70. Moreover, on August 13, 2019, in a court-ordered deposition and in furtherance of the aforesaid scheme to defraud, Patricio Cedillo committed multiple perjuries under oath as to the cause of his accident and the extent of his injuries.

71. Then, on May 22, 2023, more than five years after the staged accident, in furtherance of the Fraud Scheme, Patricio Cedillo and the Subin Firm caused to be mailed to defense counsel in the aforesaid litigation another fraudulent Bill of Particulars, verified under oath, in which Patricio Cedillo exaggerated the injuries alleged in his prior Bill of Particulars. The supplemental Bill of Particulars alleged for the first time injuries to different parts of his body that were never previously mentioned in the November 13, 2018 Bill of Particulars, as follows:

> **Left Elbow**:  Linear partial thickness tear with sprain injury evident involving the proximal common extensor; Strain; Joint derangement; Pain; Tenderness; Marked restriction of range of motion; as a result of the foregoing [Patricio Cedillo] suffers from severe pain, swelling and tenderness of the left elbow resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels muscles, tendons and ligaments with resulting pain, deformity and disability.

> **Left Hip**:  Strain; Pain; Tenderness; Marked restriction of range of motion; as a result of the foregoing [Patricio Cedillo] suffers from severe pain, swelling and tenderness of the left hip resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

> **Left Knee**:  Sprain; [Patricio Cedillo] ambulates with antalgic gait; as a result of the foregoing [Patricio Cedillo] suffers from severe pain, swelling and tenderness of the left knee resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

72. In addition to these new injuries, Patricio Cedillo in the May 22, 2023 Bill of Particulars further alleged for the first time in furtherance of Patricio Cedillo's scheme to defraud the following:

> **Other:** Thoracic spine segmental and somatic dysfunction, pain and hypertonicity; Abdominal/flank abrasion, contusions pain and tenderness; Loss of consciousness; Neurological deficits; Left leg injury; Upper back pain, spasm, numbness, tingling, trigger point and limited range of motion; Muscle pain, weakness and tenderness; Left rib/abdomen pain; Left thigh tightness; Post-traumatic stress disorder; Vertigo; and difficulty in sleeping.

73. Contrary to Patricio Cedillo's allegations as to the alleged injuries, based on his medical and workers' compensation records, many of his injuries did not exist and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

74. Medical Providers, for themselves and on behalf of Patricio Cedillo, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Patricio Cedillo, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

75. Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Providers.

76. The Wingate Firm, and later, the Subin Firm, provided by mail or by electronic service to the Queens County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Patricio Cedillo's injuries, the existence of and the extent of Patricio Cedillo's injuries, and the necessity

of medical treatment that Patricio Cedillo received in connection with the alleged workplace accident, in order to falsely bolster and add value to Patricio Cedillo's personal injury lawsuit, thereby inflating settlement value and ultimately, Defendants' financial gain from Patricio Cedillo's personal injury lawsuit.

**STAGED ACCIDENT # 2 – Carlos Figueroa-Orellana – December 17, 2018**

77. No earlier than November 17, 2018, Carlos Figueroa-Orellana began working for a subcontractor to perform construction related work at 233 Schermerhorn Street in the County of Kings, City and State of New York.  One month later, on or about December 17, 2018, Carlos Figueroa-Orellana staged his fall on some stairs at the construction site and claimed injuries resulting therefrom.

78. The accident was unwitnessed despite other personnel being present at the location.

79. Carlos Figueroa-Orellana was then taken by ambulance to a local hospital, at which a series of diagnostic tests were taken, after which he was discharged within hours without any significant clinical medical findings of injury.

80. However, upon information and belief, Carlos Figueroa-Orellana's attorneys referred him to medical providers who falsely opined on injuries where none existed or were unrelated to his alleged fall, and falsely inflated his fraudulent claim for damages.

81. On May 7, 2019, four months after his alleged fall, Carlos Figueroa-Orellana and the Wingate Firm electronically filed his complaint dated May 1, 2019, in New York County Supreme Court captioned *Carlos Figueroa-Orellana v. 250 Livingston owner LLC et al.* under Index No. 510136/2019.

82. The stairs where Carlos Figueroa-Orellana staged his fall consisted of six steps.  On September 6, 2019, he and the Wingate Firm mailed, or caused to be mailed, to defense

counsel in the aforesaid litigation his fraudulent verified Bill of Particulars, verified

under oath, alleging the following injuries:

**Cervical Spine:** C5-C5 posterior disc bulge encroaching upon the ventral aspect of the thecal sac and to some extent the lateral recesses bilaterally; C5-C6 posterior disc bulge encroaching upon the ventral aspect of the thecal sac and to some extent the lateral recesses bilaterally; Cervical radiculopathy; Severe muscle spasm; Cervical spine derangement; Myofascial neck pain syndrome; Cervicalgia; Cervical spine myofacsitis; Tenderness to palpation; Limited range of motion; Sprain/strain secondary to trauma; Cervicogenic headaches;

**Lumbar Spine:** Straightening of the curvature of the lumbar spine; Loss of the normal lordosis; Lumbar radiculopathy; Lumbar sprain/strain secondary to trauma; Lumbar displacement; Lumbar radiculopathy; Lumbar spondylosis; Chronic back pain; Restricted range of motion; Lumbalgia; Lumbar Myalgia/Myositis;

**Right Knee:** Large patellar effusion; Large suprapatellar effusion; Lateral effusion; Oblique signal in the posterior horn of the medial meniscus; Internal derangement; Sprain/strain secondary to trauma; Tenderness overlying the joint line;

**Head:** Traumatic head injury; post-concussion syndrome; Traumatic headaches; Cognitive deficit; Dizziness; Blurred vision;

**Right Shoulder:** Internal derangement of right shoulder; Sprain/strain of right shoulder; Dysfunction of right shoulder. All of the above-mentioned injuries and their natural sequelae are claimed to be permanent, except those of a temporary or superficial nature. Further, all of the aforementioned injuries, manifestations and disabilities are associated with further soft tissue injury and traumatic arthritis to the areas traumatically affected including injury, tearing, derangement and damage to the associated muscle groups, ligaments, tendons, blood vessels, blood supply, nerves and nerve tissue, soft tissue, with resultant pain, deformity and disability, stiffness, tenderness, weakness and restriction and limitation of motion and pain on motion; all injuries were caused, aggravated, exacerbated and/or caused by the accident; possibility of future surgical repair to those parts of the body claimed to have been injured in this accident; and possible loss of use of above-mentioned parts, atrophy, anxiety and mental anguish. All of the above injuries are permanent and lasting in their nature and character, with permanent effects of pain, loss of motion, disability, atrophy, anxiety and mental anguish.

83. Contrary to Carlos Figueroa-Orellana's allegations regarding the alleged injuries, based

on his medical and workers' compensation records, many of his injuries did not exist

and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

84. Medical Providers, for themselves and on behalf of Carlos Figueroa-Orellana, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Carlos Figueroa-Orellana, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

85. Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Providers.

86. The Wingate Firm, provided by mail or by electronic service to the New York County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Carlos Figueroa-Orellana's injuries, the existence of and the extent of Carlos Figueroa-Orellana's injuries, and the necessity of medical treatment that Carlos Figueroa-Orellana received in connection with the alleged workplace accident, in order to falsely bolster and add value to Carlos Figueroa-Orellana's personal injury lawsuit, thereby inflating settlement value and ultimately, Defendants' financial gain from Carlos Figueroa-Orellana's personal injury lawsuit.

**STAGED ACCIDENT #3 – Rosario Cedillo – April 12, 2019**

87. DNA Contracting & Waterproofing is the general contractor hired by The Nautilus Corp. to perform construction-related work at 2790 Bragg Street in Brooklyn, New York.

DNA Contracting & Waterproofing is a named insured under the Ionian and Liberty Mutual policies.

88. DNA Contracting & Waterproofing subcontracted with Oneteam, which in turn subcontracted with Rosario Cedillo's employer, Mucu Contracting Corp. ("Mucu"), to perform construction-related work at 2790 Bragg Street.

89. DNA Contracting & Waterproofing had started working at 2790 Bragg Street on or about June 1, 2017, and was working at the location along with Oneteam and Mucu on April 12, 2019, the day of Rosario Cedillo's staged accident.

90. Defendant Rosario Cedillo began working for Mucu at 2790 Bragg Street on or about March 19, 2019.

91. On or about April 12, 2019, approximately three weeks after beginning work for Mucu, Rosario Cedillo staged an accident at 2790 Bragg Street.   Upon further information and belief, the alleged fall was from a minimal height.

92. The accident was allegedly unwitnessed despite other personnel being present at the location.

93. Upon information and belief, Rosario Cedillo was taken by ambulance to a local hospital, at which a series of diagnostic tests were taken, after which she was discharged within hours without any significant clinical medical findings of injury.

94. However, upon information and belief, Rosario Cedillo's attorneys referred her to medical providers that falsely opined on injuries where none existed or were unrelated to her alleged fall, and falsely inflated her fraudulent claim for damages.

95. On May 13, 2019, approximately four weeks after the alleged fall, Rosario Cedillo and her attorneys filed a lawsuit. On or after April 12, 2019, and prior to May 13, 2019,

Rosario Cedillo electronically filed and/or sent, or caused to be sent, by mail, a worker's compensation claim made under the penalty of perjury, that falsely alleged a series of injuries caused by her staged accident.

96. Rosario Cedillo and the Subin Firm electronically filed her action in Queens County Supreme Court captioned *Rosario Cedillo v. Nautilus Realty Limited Partnership et al.* under Index No. 708425/2018. Until recently Rosario Cedillo was represented by the Subin Firm. On May 28, 2024, the Subin Firm moved to withdraw as Rosario Cedillo's counsel.

97. On or about April 23, 2020, Rosario Cedillo and the Subin Firm mailed to defense counsel in the litigation mentioned above a fraudulent verified Bill of Particulars, sworn under oath, alleging that she sustained the following injuries:

<u>**Neck**</u>: pain; achy; tingling; radiates to left shoulder/arm;

<u>**Left Shoulder**</u>: need for future surgery; pain; decreased range of motion;

<u>**Left Wrist**</u>: need for future surgery; pain decreased range of motion;

<u>**Cervical Spine**</u>: decreased range of motion; pain; need for future surgery;

<u>**Hip**</u>: decreased range of motion-pain-need for future surgery;

<u>**Left Ankle**</u>: decreased range of motion; ganglion within tarsal sinus; sprain-sprain of anterior talofibular ligament; calcaneofibular ligament-posterior tibial tenosynovitis; need for future surgery;

<u>**Lumbar Spine**</u>: on 06/26/2019, [Rosario Cedillo] underwent the following surgical procedure, performed by Daniel Khamimov: lumbar epidural steroid injection; fluoroscopy steroid injection fluoroscopy and contrast; decreased range of motion; pain-at LS- S1, there is a central disc herniation impressing on adjacent nerve roots-lateral disc encroach on the neural roots; lateral disc herniation impressing on the adjacent nerve roots; lateral disc herniation impressing on adjacent nerve roots; lateral disc herniations encroach on the neural foramina; need for future surgery;

**Other**: need for future surgery; need for pain medicine; difficulty in rising to walk after sitting; difficulty walking; difficulty sleeping; difficulty going up and down stairs; difficulty in carrying heavy objects; difficulty with prolonged standing; difficulty with prolonged sitting; difficulty with prolonged walking; need for physical therapy; need for anti-inflammatory medicine; loss of enjoyment of life-conscious pain and suffering.

98. In addition, and in furtherance of the scheme to defraud, the verified Bill of Particulars stated that Rosario Cedillo had incurred the following special damages:

> **Physician services:** Approximately $500,000
> **Medical supplies:** Approximately $350,000
> **X-Rays:** Approximately $250,00
> **Hospital expenses:** Approximately $500,000
> **Nurse services:** Approximately $250,000
> Other (Unspecified): $250,000

99. The alleged past incurred medical damages total $2,100,000, alleged to have incurred only one year after Rosario Cedillo's accident, is a fraudulent allegation consistent with the Defendants' overall scheme to defraud as alleged herein.

100.    Rosario Cedillo, through counsel, also alleged, without any reasonable supporting basis, that her future medical expenses were expected to be:

> **Physician services**: Approximately $500,000; and
> **Medical supplies**: Approximately $350,000.

101.    This brings Rosario Cedillo's current and future medical expenses to an incredulous total of $2,950,000.

102.    Contrary to Rosario Cedillo's allegations as to the alleged injuries, based on her medical and workers' compensation records, many of her injuries did not exist and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

103.    Medical Providers, for themselves and on behalf of Rosario Cedillo, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Rosario Cedillo, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

104.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Providers.

105.    The Subin Firm provided by mail or by electronic service to the Queens County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Rosario Cedillo's injuries, the existence of and the extent of Rosario Cedillo's injuries, and the necessity of medical treatment that Rosario Cedillo received in connection with the alleged workplace accident, in order to falsely bolster and add value to Rosario Cedillo's personal injury lawsuit, thereby inflating settlement value and ultimately, Defendants' financial gain from Rosario Cedillo's personal injury lawsuit.

**Staged Accident #4 - Barrezueta – December 23, 2020**

106.    Skyline is a named insured under the Ionian and Liberty Mutual policies and the general contractor hired by 199 Lafayette Co. LLC. to perform construction-related work at 199 Lafayette Street in the County, City and State of New York.

107.    Skyline subcontracted with Barrezueta's employer, Oneteam, to perform construction-related work at 199 Lafayette Street.

108.    Skyline had started working at 199 Lafayette Street on or about May 1, 2020. Defendant Barrazueta began working there on December 22, 2020.

109.    On December 23, 2020, after just one day on the job, Defendant Barrezueta staged his accident.

110.    Barrezueta staged his accident and falsely claimed injuries resulting therefrom. Barrezueta was on a sidewalk bridge operating a hand truck with two co-workers when one of the stones in the truck allegedly "shifted." After he and his coworkers prevented the stone from shifting, Barrezueta did not fall but simply laid down on the ground and feigned injury.

111.    Barrezueta was taken by ambulance to a local hospital at which a series of diagnostic tests were taken, after which Barrezueta was discharged within a matter of hours without any significant clinical medical findings of injury.

112.    However, upon information and belief, Barrezueta's attorneys referred him to medical providers that opined on injuries where none existed or, if existing, were unrelated to his alleged fall, and falsely inflated his fraudulent claim for damages.

113.    On December 23, 2020, the very same day Barrezueta was allegedly injured, he electronically filed and/or sent, or caused to be sent, by mail a workers' compensation claim made under the penalty of perjury that falsely claimed a series of injuries caused by his staged accident.

114.    Barrezueta also sued for personal injuries on or about November 7, 2022, by electronically filing his action in Queens County Supreme Court captioned *Erik M. Barrezueta-Orellana v. Skyline Restoration Inc. et. al.* under Index No. 723465/2022 and was represented by the Subin Firm which later moved to withdraw as Barrezueta's counsel on June 24, 2024.

115.    On May 1, 2023, Barrezueta and the Subin Firm mailed to defense counsel in the

aforesaid litigation a fraudulent verified Bill of Particulars, verified under oath, alleging

that he sustained the following injuries:

**Lumbar Operative Procedures:** As a result of the accident, [Barrezueta] was required to undergo the following operative procedure at Hudson Regional Hospital on February 04, 2022; laminectomy L4-L5 and L5-S1, foraminotomy L4-L5 and L5-S1, mesial facetectomy L4-L5 and L5-S1, intraoperative fluoroscopy with interpretation, intraoperative neurophysiologic monitoring and use of operating microscope;

As a result of the accident, [Barrezueta] was further required to undergo the following additional operative procedure at Jason Marc Gallina, MD on November 29, 2022: Posterior revision midline approach to the lumbar spine from L4-L5, revision lumbar laminectomy, revision medial facetectomy, and revision foraminotomy at L4-L5, revision neurolysis of the L4, and L5 nerve roots, revision L4-L5 microdiscectomy, use of radiographs for vertebral level localization and plastic surgery closure of wound;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on December 24, 2020: trigger point injections under ultrasound guidance;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Surgicore Surgery Center on March 11, 2021: Lumbar epidurogram and transforaminal epidural steroid injection under fluoroscopic guidance at left and right L5-S1 with radiological interpretation, spinal epidurogram under fluoroscopic guidance, interpretation of and supervision by live fluoroscopy;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on April 13, 2021: Trigger point injections and sacroiliac joint injections under ultrasound guidance;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on April 27, 2021: Sacroiliac joint injections under ultrasound guidance;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on June 11, 2021: Trigger point and sacroiliac joint injections under ultrasound guidance;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on September 24, 2021: Sacroiliac joint injections under ultrasound guidance;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Meto Point Medical, PC on October 26, 2021: Sacroiliac joint injections under ultrasound guidance;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on December 07, 2021: Sacroiliac joint injections under ultrasound guidance;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on July 22, 2022: Sacroiliac joint injections under ultrasound guidance;

**Lumbar Spine Injuries**: At L4-L5, a broad-based central disc herniation (protrusion) resulting in compression of the ventral thecal sac and narrowing of neural foramina bilaterally, at L5-S1 a broad-based central disc herniation (protrusion) resulting in compression of the ventral thecal sac and narrowing of neural foramina bilaterally;

At L3-L4 and L4-L5 posterior annular disc bulges flatten the ventral thecal sac, at L5-S1 posterior subligamentous disc bulge deforms the ventral epidural space and ventral extension of the disc, facet hypertrophic changes at L4-L5 and L5-S1 and straightening of the lordosis; Disc displacement; Radiculopathy; Sacroiliitis; Stenosis; Lumbago; Pain radiating to bilateral lower extremities; Tenderness, muscle spasm; Weakness; Stiffness, numbness, tingling; Paresthesias; Marked restriction of range of motion; Need for future surgery to the lumbar spine;

**Cervical Operative Procedures:** As a result of the accident, [Barrezueta] was required to undergo the following operative procedure at Hudson Regional Hospital on July 29, 2021: Anterior discectomy C5-C6, anterior cervical fusion, C5-C6, autograft placement, allograft placement, insertion of biomechanical cage fixation C5-C6, operative use of the microscope and intraoperative fluoroscopy with interpretation;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on January 19, 2021: Trigger point injection and bilateral greater occipital nerve blocks under ultrasound guidance;

As result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on January 26,

2021: Trigger point injections and nerve block injections under ultrasound guidance;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on February 26, 2021: Trigger point injection and bilateral greater occipital nerve blocks under ultrasound guidance;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Surgicore Surgery Center on March 04, 2021: cervical epidural steroid injection at C7-T1 with fluoroscopic needle localization and radiological interpretation, cervical epidurogram under fluoroscopic guidance, interpretation of and supervision by live fluoroscopy;

As a result of the accident, the plaintiff was required to undergo the following injection procedure at Metro Point Medical, PC on May 14, 2021: Trigger point injections and nerve block injections under ultrasound guidance;

**Cervical Spine Injuries**: At C5-C6 bilateral foraminal disc herniations with bilateral foraminal stenosis and encroachment upon the bilateral exiting C6 nerve roots, disc bulge which indents the thecal sac, at Cl-C5 and C6-C7 bulging discs indent the thecal sac, strain and straightening of lordosis; At C6-C7 broad posterior disc herniation impinging upon the thecal sac narrowing the neural foramina bilaterally, the herniation abuts the spinal cord and posterior hypertrophic changes; Sprain; Radiculopathy; Bilateral cervicobrachial syndrome; Cervicalgia; Pain radiates into the bilateral upper extremities; Stiffness, numbness, tingling; Muscle spasm; Tenderness, weakness; Paresthesias; Marked restriction of range of motion; Need for future surgery; Post-surgical scarring with significant disfigurement;

**Right Shoulder Operative Procedures:** As a result of the accident, [Barrezueta] was required to undergo the following operative procedure at Surgicore Surgery Center on May 12, 2022: Right shoulder operative arthroscopy with extensive debridement, resection long head of biceps, labral debridement, decompressive acromioplasty, excision lateral aspect coracoacromial ligament, anterior and anterior inferior acromionectomy, bursectomy;

As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on March 26, 2021: Right shoulder joint injection under ultrasound guidance;

**Right Shoulder Injuries:** Full-thickness tear of the acromio-clavicular joint capsule with joint separation and supraspinatus and infraspinatus tendinitis; Labral tear; Internal derangement; Sprain; Impingement

syndrome; Hyperemic synovitis; Bursitis; Tenderness, muscle spasm, weakness; Marked restriction of range of motion; Need for future surgery to the right shoulder; Post-surgical scarring with significant disfigurement;

**Right Knee/Leg Operative Procedures:** As a result of the accident, [Barrezueta] was Required to undergo the following operative procedure at Fifth Avenue Surgery Center Extension Clinic on June 21, 2022: Operative arthroscopy of the right knee with a partial medial meniscectomy, partial synovectomy with plica resection and coblation arthroplasty of grade II patella;

**Right Knee/Leg Injuries:** Longitudinal tear at the anterior root attachment of the medial meniscus with joint effusion; Internal derangement; Sprain; Thickened plica with synovitis; Grade II traumatic chondromalacia of the patella lateral facet; Edema; Tenderness; Muscle spasm, weakness; Marked restriction of range of motion; Need for future surgery to the right leg/knee; Post-surgical scarring with significant disfigurement;

**Left Knee/Leg Operative Procedures:** As a result of the accident, [Barrezueta] was required to undergo the following operative procedure at Surgicore Surgical Center of Jersey City on August 16, 2021: Knee arthroscopy, synovectomy, partial medial meniscectomy, chondroplasty and co-ablation;

**Left Knee/Leg Injuries:** Focal longitudinal tear at the anterior root attachment of lateral meniscus and joint effusion; Traumatic meniscus injury; Internal derangement; Sprain; Synovitis; Edema; Tenderness; Weakness; Marked restriction of range of motion [Barrezueta] ambulate with antalgic gait; Need for future surgery to the left knee /leg; Post-surgical scarring with significant disfigurement;

**Thoracic Operative Procedures:** As a result of the accident, [Barrezueta] was required to undergo the following injection procedure at Metro Point Medical, PC on December 24, 2020: Trigger point injections under ultrasound guidance;

**Thoracic Spine Injuries:** Tenderness; Muscle spasm;

**Right Hip Injuries:** Internal derangement; Sprain; Marked restriction of range of motion;

**Right Elbow Injuries:** Sprain;

**Head/Brain Injuries:** Loss of consciousness; post-concussion syndrome; Memory and cognitive dysfunction; Closed head injury; Bilateral tinnitus;

Blurred vision; Depression; Anxiety; Post-traumatic headache; Dizziness; Insomnia; Mood changes; Photophobia; Phonophobia;

**Other Injuries:** Myofascial pain syndrome; Myalgia; Right hand pain and weakness; Abdominal pain; Abdominal wall swelling; Vertigo; Post-traumatic stress disorder; Difficulty in sleeping; All injuries are permanent and progressive in nature except those of a superficial nature. [Barrezueta] may also develop arthritis. Above injured areas may require future surgery. Above injured areas may develop post-traumatic arthritis.

116.   Barrezueta further alleged physicians' services of approximately $100,000 and continuing and hospital expenses of approximately $5,000.

117.   In continuing the scheme to defraud, Barrezueta procured a fabricated Total Safety Consulting OSHA training certificate which he presented to Skyline to secure access to the subject jobsite.

118.   When seeking employment, Barrezueta provided a false home address to Skyline: 102-2 Martense Avenue, Queens, New York, which does not exist. This is the same false address he listed for his emergency contact, defendant Carlos Figueroa Orellana.

119.   Moreover, Barrezueta has been identified in videos that, upon information and belief, demonstrate that he has not suffered any of the aforementioned injuries for which he claims.  Specifically, he is able to move in such a way that he would otherwise not be able to with such injuries.

120.   Contrary to Barrezueta's allegations regarding the alleged injuries, based on his medical and workers' compensation records, many of his injuries did not exist and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

121.    Medical Providers, for themselves and on behalf of Barrezueta, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Barrezueta, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

122.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Providers.

123.    The Subin Firm, provided by mail or by electronic service to the Queens County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Barrezueta's injuries, the existence of and the extent of Barrezueta's injuries, and the necessity of medical treatment that Barrezueta received in connection with the alleged workplace accident, in order to falsely bolster and add value to Barrezueta's personal injury lawsuit, thereby inflating settlement value and ultimately, Defendants' financial gain from Barrezueta's personal injury lawsuit.

**Staged Accident #5 – Wilson Barrezueta – July 15, 2021**

124.    Wilson Barrezueta began working for a subcontractor to perform construction -related work at 75 Lewis Avenue, Kings County, New York, on or about July 12, 2021.

125.    On or about July 15, 2021, two days after he began working at 75 Lewis Avenue, Wilson Barrezueta staged his accident and claimed injuries resulting therefrom. Upon information and belief, Wilson Barrezueta allegedly fell from a height of less than ten feet.

126.    The accident was unwitnessed despite other personnel being present at the location.

127.    Wilson Barrezueta was taken by ambulance to a local hospital at which a series of diagnostic tests were taken, after which he was discharged within hours without any significant clinical medical findings of injury.

128.    However, upon information and belief, Wilson Barrezueta was referred to medical providers that falsely opined on injuries where none existed or were unrelated to his alleged fall, and falsely inflated his fraudulent claim for damages.

129.    On September 22, 2021, two months after his alleged fall, Wilson Barrezueta and the Subin Firm electronically filed his complaint in Kings County Supreme Court captioned *Wilson Barrezueta v. A.A.D. Construction Corp. et al.* under Index No. 524072/2021. Wilson Barrezueta was represented by the Subin Firm until June 12, 2024, when the Subin Firm withdrew as plaintiff's counsel.

130.    On February 16, 2022, Wilson Barrezueta and the Subin Firm mailed to defense counsel in the aforesaid litigation his fraudulent verified Bill of Particulars, verified under oath, alleging the following injuries:

> **CERVICAL SPINE**: At C3-C4 level, central disc herniation with posterior disc bulge impinging upon anterior thecal sac; At C4-C5 and C5-C6 levels, posterior disc bulge impinging upon anterior thecal sac; Sprain; Bilateral cervicobrachial syndrome;
>
> Reversal of normal curvature; Cervicalgia; Pain radiates into base of head and bilateral shoulders; Muscle spasms; Stiffness; Tenderness; Decreased sensation; Marked restriction of range of motion.
>
> As a result of the accident, the [Wilson Barrezueta] was required to undergo the following procedure at Metro Point Medical, P.C. on August 17, 2021: Cervical paraspinal muscles using ultrasound guidance cocktail of Marcaine, lidocaine and Sarapin was injected into multiple areas of pain using sterile technique. As a result of the foregoing the [Wilson Barrezueta] suffers from severe pain, swelling and tenderness of the cervical spine resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve

endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

**LUMBAR SPINE**: At LA-I-5 level, posterior bulge disc impinging upon anterior thecal sac with encroachment into foramina bilaterally and bilateral foraminal stenosis; bilateral sacroiliac joint sprain; Straightening of curvature; Lumbago; Bilateral sacroiliac joint pain radiates into bilateral leg, buttocks and left knee; Muscle spasms; Tenderness; Marked restriction of range of motion; Possible need for future surgery.

As a result of the accident, the plaintiff was required to undergo the following procedure at Metro Point Medical, P.C. on July 30, 2021, and September 03, 2021: Lumbar spine under ultrasound guidance cocktail of Marcaine, lidocaine and examethasone injection injected into bilateral sacroiliac joints space using sterile technique.

As a result of the foregoing the plaintiff suffers from severe pain, swelling and tenderness of the lumbosacral spine resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

**LEFT SHOULDER**: Partial tear of distal supraspinatus tendon; Internal derangement; Sprain; Synovitis; Joint effusion; Edema in distal clavicle; Decreased strength; Tenderness; Marked restriction of range of motion.

**RIGHT ELBOW**: Partial intrasubstance tear of proximal extensor As a result of the foregoing the plaintiff suffers from severe pain, swelling and tenderness of the left shoulder resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability. tendon; Sprain; Synovitis; Joint effusion; Decreased strength; Marked restriction of range of motion, as a result of the foregoing the plaintiff suffers from severe pain, swelling and tenderness of the right elbow resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of vessels, muscles, tendons.

**RIGHT SHOULDER**: Internal derangement; Sprain; Decreased strength; Tenderness; Marked restriction of range of motion.

As a result of the foregoing the plaintiff suffers from severe pain, swelling and tenderness of the right shoulder resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

**BILATERAL WRIST**: Internal derangement; Sprain; Weakness; Tenderness; Numbness; Marked restriction of range of motion.

As a result of the foregoing the plaintiff suffers from severe pain, swelling and tenderness of the bilateral wrist resulting in loss of strength, loss of function, loss of-motion, restriction of movement, all with involvement of vessels, muscles, tendons;

**LEFT KNEE**: Internal derangement; Sprain; Synovitis;  Joint effusion; Contusion; Edema; Weakness; Tenderness; Marked restriction of range of motion;

As a result of the foregoing the plaintiff suffers from severe pain, swelling and tenderness of the left knee resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

**RIGHT KNEE**: Internal derangement; Sprain; Weakness; Tenderness; Marked restriction of range of motion.

As a result of the foregoing the plaintiff suffers from severe pain, swelling and tenderness of the right knee resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of vessels, muscles, tendons;

**THORACIC SPINE**: Sprain; Thoracalgia; Muscle spasm; Tenderness; Marked restriction of range of motion.

As a result of the foregoing the plaintiff suffers from severe pain, swelling and tenderness of the thoracic spine resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

**OTHER**:  Head injury with post-traumatic headaches and dizziness; Myofascial pain syndrome; Loss of consciousness; Bilateral arm pain; Left leg pain, weakness and decreased sensation; Left hip pain; Left hand reduced strength; Bilateral upper extremities weakness, tingling, decreased sensation and numbness; Left lower extremities reduced strength, tingling, decreased sensation and numbness; Right lower extremities tingling and numbness; Antalgic gait; Vertigo;

The foregoing injuries directly affected the bones, tendons, tissues, muscles ligaments, nerves, blood vessels and soft tissue in and about the involved

areas and sympathetic and radiating pains from all of which the plaintiff suffered, still suffers and may permanently suffer and may develop arthritis;

As a result of the accident and the injuries herein sustained, the plaintiff suffered a severe shock to his nervous system. The plaintiff verily believes that all of the injuries hereinabove sustained, with the exception of bruises and contusions, are permanent and progressive in nature.

131.    Contrary to Wilson Barrezueta's allegations regarding the alleged injuries, based on his medical and workers' compensation records, many of his injuries did not exist and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

132.    Medical Providers, for themselves and on behalf of Wilson Barrezueta, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Wilson Barrezueta, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

133.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Providers.

134.    The Subin Firm, provided by mail or by electronic service to the Kings County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Wilson Barrezueta's injuries, the existence of and the extent of Wilson Barrezueta's injuries, and the necessity of medical treatment that Wilson Barrezueta received in connection with the alleged workplace accident, in order to falsely bolster and add value to Wilson Barrezueta's personal injury

lawsuit, thereby inflating settlement value and ultimately, Defendants' financial gain from Wilson Barrezueta's personal injury lawsuit.

**Staged Accident #6 - Fajardo – November 24, 2021**

135.    Skyline is a named insured under the Ionian and Liberty Mutual policies and the general contractor hired by Park Belvedere Condominium to perform construction related work at 101 West 79th Street in the County, City, and State of New York.

136.    Skyline subcontracted with Oneteam, which in turn subcontracted with Fajardo's employer CLMM Construction Corp. ("CLMM") to perform construction related work at 101 West 79th Street.

137.    Skyline started working at 101 West 79th Street on or about January 8, 2018, and both Oneteam and CLMM were working at the location on November 24, 2021, the day of Fajardo's staged accident.

138.    Defendant Fajardo began working for CLMM at 101 West 79th Street on or about November 22, 2021.

139.    On or about November 24, 2021, a few days after he began working at 101 West 79th Street, Fajardo staged his accident – an alleged fall downstairs of less than ten feet – and claimed injuries resulting therefrom.

140.    The accident was unwitnessed despite other personnel being present at the location. There was no condition on the stairs that could have caused such a fall.

141.    Fajardo was taken by ambulance to a local hospital at which a series of diagnostic tests were taken, and he was discharged within a matter of hours without any significant clinical medical finding of injury.

142.    However, upon information and belief, Fajardo's attorneys referred him to medical providers that falsely opined on injuries where none existed or were unrelated to his alleged fall, and falsely inflated his fraudulent claim for damages.

143.    On or about January 31, 2022, two months after his alleged fall, Fajardo electronically filed and/or sent, or caused to be sent, by mail a workers' compensation claim made under the penalty of perjury which falsely claimed a series of injuries caused by his staged accident.

144.    Then, on or about February 15, 2022, less than three months after his alleged fall, Fajardo and the Subin Firm electronically filed his action in Queens County Supreme Court captioned *Freddy Fajardo v. The Board of Managers of The Park Belvedere Condominium* under Index No. 703464/2022. Fajardo was represented by the Subin Firm until March 20, 2024, when the Subin Firm was substituted as counsel.

145.    Following the alleged accident, Fajardo has been identified in videos wherein, upon information and belief, he doesn't appear to have suffered in of the injuries for which he claims.  Specifically, he is able to move in such a way that he would otherwise not be able to with such injuries.

146.    Moreover, following the alleged accident, Fajardo has continued working as a barber which, again, is inconsistent with his alleged injuries.

147.    Contrary to Fajardo's allegations regarding the alleged injuries, based on his medical and workers' compensation records, many of his injuries did not exist and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

148.    Medical Providers, for themselves and on behalf of Fajardo, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Fajardo, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

149.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Providers.

150.    The Subin Firm, provided by mail or by electronic service to the Queens County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Fajardo's injuries, the existence of and the extent of Fajardo's injuries, and the necessity of medical treatment that Fajardo received in connection with the alleged workplace accident, in order to falsely bolster and add value to Fajardo's personal injury lawsuit, thereby inflating settlement value and ultimately, Defendants' financial gain from Fajardo's personal injury lawsuit.

**Staged Accident #7 - Bravo – December 14, 2021**

151.    Skyline is a named insured under the Ionian and Liberty Mutual policies and the general contractor hired by the Trump Palace Condominium to perform construction-related work at 200 East 69th Street in the County, City, and State of New York.

152.    Skyline subcontracted with Bravo's employer, Oneteam, to perform construction-related work at 200 East 69th Street.

153.    Skyline had started working at 200 East 69th Street on or about June 20, 2021, and was working at the location on December 14, 2021, the day of Bravo's staged accident.

154.     Defendant Bravo began working for Oneteam at 200 East 69th Street on or about November 29, 2021.

155.     On or about December 14, 2021, approximately two weeks after he began working at 200 East 69th Street, Bravo staged his accident – an unwitnessed fall downstairs carrying construction material –claiming injuries resulting therefrom.

156.     The accident was unwitnessed despite other personnel being present at the location.

157.     Bravo was taken by ambulance to a local hospital at which a series of diagnostic tests were taken, and he was thereafter discharged within a matter of hours without any significant clinical medical finding of injury.

158.     However, upon information and belief, Bravo's attorney referred him to medical providers that falsely opined on injuries where none existed or were unrelated to his alleged fall, and falsely inflated his fraudulent claim for damages.

159.     On December 20, 2021, less than one week after his alleged fall, Bravo and the Schwitzer Firm filed an action in Bronx County Supreme Court captioned *Ronald Efrain Bravo Orellana v. Donald Trump et al.* under Index No. 817251/2021E.

160.     Thereafter, on January 13, 2022, Bravo electronically filed and/or sent, or caused to be sent, by mail workers' compensation claim made under the penalty of perjury that falsely claimed a series of injuries caused by his staged accident.

161.     On October 31, 2022, Bravo and the Schwitzer Firm mailed to defense counsel in the aforesaid litigation a fraudulent verified Bill of Particulars verified under oath on his behalf by his attorney Christopher W. Drake Esq., of the law firm of William Schwitzer & Associates, alleging that he sustained the following injuries:

**<u>Lumbar Spine</u>**: L4-L5 herniation/tear; L5-S1 herniation required Bravo to undergo the following procedure on October 6, 2022 by Dr. Alexandra

Carrer, MD at Hudson Regional Hospital; L5-Sl anterior lumbar interbody fusion with titanium cage packed with allograft; L5-Sl placement of biomechanical device; L4-5 anterior lumbar interbody fusion with titanium cage packed with allograft; L4-5 placement of biomechanical device; Application of morselized allograft; Use of intraoperative fluoroscopy over one hour.

Post-Surgical scarring; Sprain/strain; Loss of strength; Marked restriction in range of motion; Internal derangement; Spasms; Radiculopathy; Adjacent segment degeneration; Numbness, tenderness, and tingling; post-traumatic arthritis: Severe pain, swelling, and tenderness; Striking nerve pain and numbness: Need for injections: and need for future surgery.

**Left Shoulder**:  Tear of Rotator Cuff; Labrum tears; Synovitis; Left shoulder surgical arthroscopy with complete synovectomy; Left shoulder surgical arthroscopy with extensive debridement; Left shoulder surgical arthroscopy with lysis of adhesions; Left shoulder surgical arthroscopy with subacromial decompression with partial anterior acromioplasty; Left shoulder surgical arthroscopy with CA ligament release and bursectomy; Left shoulder surgical arthroscopy with PRP injection;

Post-Surgical scarring; Injections; Effusion; Contusion; Sprain/strain; Loss of strength; Marked restriction in range of motion; Internal derangement; Spasms: Numbness, tenderness, and tingling; post-traumatic arthritis; Severe pain, swelling, and tenderness; Need for injections; and Need for future surgery;

**Right Shoulder**: Tear of the rotator cuff; Tear of labrum; Synovitis; Effusion; Contusion; Sprain/strain; Loss of strength; Marked restriction in range of motion; Internal derangement; Spasms;  Numbness, tenderness, and  tingling;   Post-traumatic arthritis;  Severe pain,  swelling,  and tenderness; Need for injections: and Need for future surgery;

**Cervical Spine**: Marked restriction in range of motion; Internal derangement; Spasms; Radiculopathy; Adjacent segment degeneration; Numbness, tenderness, and tingling; post-traumatic arthritis; Severe pain. swelling, and tenderness Striking nerve pain and numbness; Need for injections; and need for future surgery;

**Right Hip**: Tear of the labrum; Sprain/strain; Loss of strength; Marked restriction in range of motion; Internal derangement; Spasms; Numbness, tenderness, and tingling; post-traumatic arthritis; Severe pain, swelling. and tenderness; Need for injection; and need for future surgery.

162.    Then, eight months after his original Verified Bill of Particulars, Bravo submitted

his First Supplemental Bill of Particulars, dated June 23, 2023, in which he and his

counsel alleged for the first time injuries to his left knee, including a surgical procedure

that was not mentioned in the original Verified Bill of Particulars as follows:

**Left Knee**: Left knee surgical arthroscopy with major synovectomy; Left
knee surgical arthroscopy with abrasion chondroplasty of medial tibial
plateau and lateral tibial plateau; Left knee surgical arthroscopy with partial
medial and partial lateral meniscectomis; Left knee surgical arthroscopy
with arthrocentesis; Left knee surgical arthroscopy with co-ablation
arthroplasty of chondral lesion of patellae; Left knee surgical arthroscopy
with debridement of partial ACL tear; left knee arthroscopy with PRP
injection;

With a post operative diagnosis to wit: Left knee chondral lesion of patella,
ateral tibial plateau, and medial tibial plateau; Left knee partial anterior
cruciate ligament tear; Left knee medial meniscal tear; Left knee lateral
meniscal tear; Left knee traumatic arthropathy of the knee; Left knee
synovitis of the knee; Internal derangement; Effusion; Sprain/strain;
Contusions; Loss of strength; post- traumatic arthritis; post-surgical scaring;
Marked restriction in range of motion; Severe pain, swelling, and tenderness;
Need for future surgery.

163.    In his October 31, 2022 Bill of Particulars, Bravo alleged $350,000 for anticipated

medical expenses. Then, in his First Supplemental Bill of Particulars (June 23, 2023),

Bravo alleged $70,000 of incurred medical expenses with additional anticipated

medical expenses of FIVE MILLION DOLLARS ($5,000,000.00). His Third

Supplemental Bill of Particulars (November 30, 2023) alleged additional medical

expenses of $55,000 with additional anticipated medical expenses of SIX MILLION

FIVE HUNDRED THOUSAND DOLLARS ($6,500,000.00). His Fourth

Supplemental Bill of Particulars (April 19, 2024) claimed additional medical expenses

of $150,000 with additional anticipated medical expenses of EIGHT MILLION FIVE

HUNDRED THOUSAND DOLLARS ($8,500,000.00). All this stems from an

unwitnessed accident in which Bravo allegedly fell a maximum of ten feet on a stairway.

164.    Contrary to Bravo's allegations regarding the alleged injuries, based on his medical and workers' compensation records, many of his injuries did not exist and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

165.    Medical Providers, for themselves and on behalf of Bravo, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Bravo, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

166.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Providers.

167.    The Schwitzer Firm, provided by mail or by electronic service to the Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Bravo's injuries, the existence of and the extent of Bravo's injuries, and the necessity of medical treatment that Bravo received in connection with the alleged workplace accident, in order to falsely bolster and add value to Bravo's personal injury lawsuit, thereby inflating settlement value and ultimately, Defendants' financial gain from Bravo's personal injury lawsuit.

**Staged Accident #8 - Montesdeoca – January 19, 2022**

168.     Skyline is a named insured under the Ionian and Liberty Mutual Policies and the general contractor hired by 55 Liberty Owners Corp. to perform construction-related work at 55 Liberty Street in the County, City, and State of New York.

169.     Skyline subcontracted with Oneteam, which in turn subcontracted with Montesdeoca's employer, CLMM, to perform construction-related work at 55 Liberty Street.

170.     Skyline had started working at 55 Liberty Street on or about January 13, 2021, and both Oneteam and CLMM were working at the location on January 19, 2022, the day of Montesdeoca's staged accident.

171.     Defendant Montesdeoca began working for CLMM at 55 Liberty Street on or about January 12, 2022.

172.     On or about January 19, 2022, about one week after he began working at 55 Liberty Street, Montesdeoca staged his accident, claiming injuries resulting from an alleged fall downstairs of less than ten feet.

173.     The accident was unwitnessed despite other personnel being present at the location.

174.     Montesdeoca was taken by ambulance to a local hospital at which a series of diagnostic tests were taken, after which he was discharged within a matter of hours without any significant clinical medical finding of injury.

175.     However, upon information and belief, Montesdeoca's attorneys referred him to medical providers that falsely opined on injuries where none existed or were unrelated to his alleged fall, and falsely inflated his fraudulent claim for damages.

176.    On January 20, 2022, one day after his alleged fall, Montesdeoca electronically filed and/or sent, or caused to be sent, by mail a workers' compensation claim made under the penalty of perjury that falsely claimed a series of injuries caused by his staged accident.

177.    On February 11, 2022, approximately three weeks after his alleged fall, Montesdeoca and the Schwitzer Firm electronically filed his action in New York County Supreme Court captioned *Cristhian Orlando Montesdeoca Peralta v. 55 Liberty Owners Group and In House Group* under Index No. 151205/2022.

178.    After staging a fall of less than ten feet down a flight of stairs, Montesdeoca and the Schwitzer Firm mailed to defense counsel in the aforesaid litigation **seven** (on August 24, 2022; November 8, 2022; March 10, 2023; May 5, 2023; January 23, 2024; May 4, 2024 and June 19, 2024) fraudulent bills of particulars, verified under oath, falsely alleging that he sustained injuries.

179.    In the Bill of Particulars dated August 24, 2022, which was also electronically filed with the trial court, Montesdeoca alleged the following injuries from his staged accident:

> **Cervical Spine**: C5-6 herniation; Spasms; Radiculopathy; Internal derangement; Sprain/strain; Loss of strength; post-traumatic arthritis; Marked in range of motion; Adjacent segment degeneration; Severe pain, swelling and tenderness; Numbness, tenderness and tingling; Need for future surgery. As a result of the foregoing, Plaintiff suffers from severe pain, swelling and tenderness of the cervical spine resulting in loss of strength, loss of function, loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

> **Lumbar Spine**: L5-S1 herniation; L4-5 herniation; spasms; radiculopathy; internal derangement; Sprain/strain; Loss of strength; post-traumatic arthritis; Marked restriction in range of motion; Adjacent segment

degeneration; Severe pain, swelling and tenderness; Numbness, tenderness and tingling Need for future surgery. As a result of the foregoing, Plaintiff suffers from severe pain, swelling and tenderness of the lumbar spine resulting in loss of strength, loss of motion, loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

**Right Shoulder**: Tear of anterior labrum; Internal derangement; Sprain/strain Loss of strength post-traumatic arthritis; Marked restriction in range of motion; Severe pain, swelling and tenderness; Numbness, tenderness and tingling; Need for future surgery. As a result of the foregoing, [Montesdeoca] suffers from severe pain, swelling and tenderness of the right shoulder resulting in loss of strength, loss of function, loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

**Right Elbow**: Tear of common flexor tendon; Edema; internal derangement; Sprain/strain; Loss of strength; Post traumatic arthritis; Marked restriction in range of motion; Severe pain, swelling and tenderness; Numbness, tenderness and tingling; Need for future surgery. As a result of the foregoing, [Montesdeoca] suffers from severe pain, swelling and tenderness of the right elbow resulting in loss of strength, loss of function, loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

**Right Wrist**: Tear of triangular fibrocartilage; Right Wrist: Tear of extensor carpi ulnaris tendon; Right Wrist: Tera of triangular fibrocartilage; Edema; Right Wrist: Tera of triangular fibrocartilage; Edema; Internal derangement; Sprain/strain; Loss of strength traumatic arthritis; Marked restriction in range of motion; Severe pain, swelling and tenderness; Numbness, tenderness and tingling; Need for future surgery. As a result of the foregoing, [Montesdeoca] suffers from severe pain, swelling and tenderness of the right wrist resulting in loss of strength, loss of function, loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

**Left Wrist**: Tear of triangular fibrocartilage; Tear of radio scaphoid ligament; Effusion; Edema; Internal derangement; Sprain/strain; Loss of strength; post-traumatic arthritis; Marked restriction in range of motion; Severe pain, swelling and tenderness; Numbness, tenderness and tingling; Need for future surgery. As a result of the foregoing Plaintiff suffers from severe pain, swelling and tenderness of the left wrist resulting in loss of

strength, loss of function, loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

**Right Hip**: Tear of gluteus minimus tendon; Edema; Internal derangement; Sprain/strain; Loss of strength; post-traumatic arthritis; Marked restriction in range of motion; Severe pain, swelling and tenderness; Numbness, tenderness and tingling: Need for future surgery. As a result of the foregoing, [Montesdeoca] suffers from severe pain, swelling and tenderness of the right hip resulting in loss of strength, loss of loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

**Left Hip**: Tear of anterior femoroacetabular labrum; Internal derangement; Sprain/strain; Loss of strength; post-traumatic arthritis; Marked restriction in range of motion; Severe pain, swelling and tenderness; Numbness, tenderness and tingling; Need for future surgery. As a result of the foregoing, [Montesdeoca] suffers from severe pain, swelling and tenderness of the left hip 'resulting in loss of strength, loss of function, loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

**Right Ankle**: Tear of deltoid ligament; Internal derangement; Sprain/strain; Loss of strength; post-traumatic arthritis; Marked restriction in range of motion Severe pain, swelling and tenderness; Numbness, tenderness and tingling; Need for future surgery. As a result of the foregoing, [Montesdeoca] suffers from severe pain, swelling and tenderness of the right ankle resulting in loss of strength, loss of function, loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons. and ligaments with resulting pain, deformity and disability;

**Left Knee**: Tear of medial meniscus; Joint effusion; Internal derangement; Sprain/strain; Loss of strength; post-traumatic arthritis; Marked restriction in range of motion; Severe pain, swelling and tenderness; Numbness, tenderness and tingling; Need for future surgery. As result of the foregoing, [Montesdeoca] suffers from severe pain, swelling and tenderness of the left knee resulting in loss of strength, loss of function, loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

**Right Knee**: Tear of anterior cruciate ligament; Effusion; Internal derangement; Sprain/sprain; Loss of strength; post-traumatic arthritis; Marked restriction in range of motion; Severe pain, swelling and tenderness; Numbness, tenderness and tingling; Need for future surgery. As a result of the foregoing, [Montesdeoca] suffers from severe pain, swelling and tenderness of the right knee resulting in loss of strength, loss of motion, loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability;

**Left Ankle**: Internal derangement; Sprain/strain loss of strength; post-traumatic arthritis; Marked restriction in range of motion; Severe pain, swelling and tenderness; Numbness, tenderness and tingling; Need for future surgery. As a result of the foregoing, [Montesdeoca] suffers from severe pain, swelling and tenderness of the left ankle resulting in loss of strength, loss of function, loss of motion, restriction of movement all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

180.    In his original Bill of Particulars (August 24, 2022), Montesdeoca alleged $50,000 for anticipated medical expense. This was followed by: his first supplemental Bill of Particulars (November 8, 2022) with an additional estimated cost of $25,000 for medical expenses; his second supplemental Bill of Particulars (March 10, 2023) claiming additional medical expenses of $115,000; his third supplemental Bill of Particulars (May 5, 2023) claiming additional medical expenses of $75,000; his fourth supplemental Bill of Particulars (January 23, 3024) claiming additional medical expenses of SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($7,5000,00.00); his fifth supplemental Bill of Particulars (May 4, 2024) claiming EIGHT MILLION FIVE HUNDRED THOUSAND DOLLARS in anticipated medical expenses; and his sixth supplemental Bill of Particulars (August 19, 2024) claiming an additional $200,000 in medical expenses. All of this stems from an unwitnessed accident in which he allegedly fell less than ten feet on a stairway.

---

181.    On August 31, 2023, Montesdeoca then committed multiple perjuries at his deposition not only by falsely testifying about his alleged fall and subsequent injuries, but by repeatedly concealing his knowledge of co-defendants Barrezueta, Tzay and Carlos Figueroa-Orellana, who are all participants in the Fraud Scheme.

182.    Contrary to Montesdeoca's allegations regarding the alleged injuries, based on his medical and workers' compensation records, many of his injuries did not exist and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

183.    Medical Providers, for themselves and on behalf of Montesdeoca, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Montesdeoca, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

184.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Providers.

185.    The Schwitzer Firm, provided by mail or by electronic service to the New York County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Montesdeoca's injuries, the existence of and the extent of Montesdeoca's injuries, and the necessity of medical treatment that Montesdeoca received in connection with the alleged workplace accident, in order to falsely bolster and add value to Montesdeoca's personal injury

lawsuit, thereby inflating settlement value and ultimately, Defendants' financial gain from Montesdeoca's personal injury lawsuit.

**Staged Accident #9 - Tzay – April  25, 2022**

186.     Skyline is a named insured under the Ionian and Liberty Mutual policies and the general contractor hired by The Promenade Condominium Corp. to perform construction-related work at 530 East 76th Street in the County, City and State of New York.

187.     Skyline subcontracted with Oneteam which in turn subcontracted with Tzay's employer D'Zahara Construction Corp. ("D'Zahara") to perform construction services at 530 East 76th Street.

188.     Skyline started working at 530 East 76th Street on or about December 1, 2020, and both Oneteam and D'Zahara were working at the location on April 25, 2022, the day of Tzay's staged accident.

189.     Defendant Tzay began working for D'Zahara at 530 East 76th Street on or about April 20, 2022.

190.     On or about April 25, 2022, approximately five days after he began working at 530 East 76th Street, Tzay staged his accident and claimed injuries resulting from an unwitnessed fall of less than six feet, which allegedly occurred while carrying/reaching for construction material.

191.     The accident was unwitnessed despite other personnel being present at the location.

192.     Tzay was then taken by ambulance to a local hospital, where diagnostic tests were performed.  Tzay was discharged within hours without any significant clinical medical finding of injury.

193.    However, upon information and belief, Tzay's attorneys referred him to medical providers that falsely opined on injuries where none existed or were unrelated to his alleged fall, and falsely inflated his fraudulent claim for damages.

194.    On May 13, 2022, less than a month after his alleged fall, Tzay electronically filed his action in the New York County Supreme Court captioned *Miguel Angel Teleguario Tzay v. Premiere Properties Inc.* under Index No. 154157 /2022.

195.    Thereafter, Tzay electronically filed and/or sent, or caused to be sent, by mail a workers' compensation claim made under the penalty of perjury that falsely claimed a series of injuries caused by his staged accident.

196.    On May 23, 2023, Tzay mailed or caused to be mailed to defense counsel in the aforesaid litigation, a fraudulent verified Bill of Particulars, verified under oath, alleging that he sustained the following injuries:

**Right Knee**: On March 27, 2023, [Tzay] underwent the following surgery:

**Preoperative Diagnosis**: Right knee rules out meniscal tear, internal derangement;

**Postoperative Diagnosis**: Right knee bilateral meniscal tear, chondromalacia of the medial tibial plateau, chondromalacia of the lateral tibial plateau, chondromalacia of the patella, chondromalacia of the medial femoral condyle, internal adhesions, partial anterior cruciate ligament tear, and synovitis;

**Procedures Performed:** Right knee diagnostic arthroscopy; Right knee operative arthroscopy with bilateral meniscectomy; Chondroplasty of the medial tibial plateau; Chondroplasty of the lateral tibial plateau; Chondroplasty of the medial femoral condyle; Chondroplasty of the patella; Lysis of adhesions; Debridement of ACL; Synovectomy; Injection;

**Left Shoulder**: Healed/healing fracture deformity of the distal clavicle with grade 2-3 separation of the acromioclavicular joint; Rotator cuff tear in the anterior supraspinatus tendon as well as the posterior distal insertion of the

infraspinatus tendon; SLAP tear extending into the anterior superior labrum; Mild thickening the inferior joint capsule; Subdeltoid and subacromial bursal effusion. Joint effusion; AC joint separation with extensive heterotopic ossification in the region of the coracoclavicular ligament and AC ligament. Acromion is inferiorly displaced by 11 mm; Coracoclavicular distance is increased 18 mm. The acromion has lateral downslope; Tenderness; Severe shoulder pain; will require future surgery;

**Neck**:  At C4-C5, there is a broad posterior disc herniation impinging upon the thecal sac narrowing the neural foramina bilaterally. The herniation abuts the spinal cord; At C5-C6, there is a central to right paracentral disc herniation impinging upon the thecal sac and right lateral recess and directly upon the spinal cord with bilateral foraminal narrowing ; At C6-C7, there is a central posterior disc herniation impinging upon the thecal sac with mild narrowing of the right-sided neural foramen; Disc herniations at C4-5 and C5-6 with central and bilateral foraminal narrowing impinging directly upon the spinal cord; Disc herniation at C6-7 with central and bilateral foraminal narrowing; Bilateral C5-C6 Radiculopathy; Acute left C5-6 Radiculopathy; bilateral sensory median nerve neuropathy; Tenderness; Severe neck pain; will require future surgery;

**Head**:  Small bilateral periventricular white matter; Post traumatic headaches; Brachial plexus disorders; Photophobia; Nausea; Vomiting; Headaches; Ringing in the ears;

**Back**: Bulging disc at L4-5 with bi-foraminal encroachment and bilateral foraminal stenosis; Bulging disc at L5-S1 with right foraminal herniation demonstrating near impingement upon the exiting L5 root; Bulging disc at L2-3, L3-4; There are disc bulges at L4-5 and L5-S1 impinging upon the thecal sac and anterior epidural fat; Bilateral L5-S1 Radiculopathy; motor peroneal neuropathy; Tenderness; Severe back pain; Spinal shock; Bruising; Will require future surgery Tear of the free margin of the body of the medial meniscus; Tears of the anterior and posterior cruciate ligaments; Extrusion medial meniscus into the meniscofemoral space with associated tear of the medial collateral ligament; Joint effusion; Severe right knee pain; Bruising; Will require future surgery;

**Right Elbow**: High-grade tear of the origin of the lateral ulnar collateral ligament with associated joint effusion; Partial tear of the origin of the common extensor tendon with associated soft tissue edema; Extensor tendon pain; Severe right elbow pain; Bruising; will require future surgery.

---

197.    In the May 23, 2023 Bill of Particulars, Tzay swore under oath that he had incurred approximately $105,000 in physician and hospital services from an unwitnessed fall of less than six feet.

198.    Furthermore, in a deposition on October 14, 2024, admitted to committing fraud in States of New Jersey, New York and against his auto insurance carrier by using a friend's home address to obtain his license and insurance in New Jersey because it was cheaper than having insurance in New York.  Tzay, however, never lived in New Jersey and was living in the State of New York.

199.    Moreover, in his deposition on October 29, 2024, Tzay testified that he knew Defendant Erik Barrezueta as a co-worker of his sister-in-law.

200.    Contrary to Tzay's allegations regarding the alleged injuries, based on his medical and workers' compensation records, many of his injuries did not exist and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

201.    Medical Providers, for themselves and on behalf of Tzay, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Tzay, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

202.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider.

**Staged Accident #10 – Erwin Marin – October 11, 2022**

203.   Urban is a named insured under the Ionian and Liberty Mutual policies and a contractor hired by DaPaul Realty Corp. to perform construction-related work at 48 Howard Street in the County, City and State of New York.

204.   DePaul Realty Holding LLC was the general contractor contracted to perform construction-related work at 48 Howard Street in the County, City, and State of New York.

205.   Urban had started working at 48 Howard Street on or about July 31, 2021, and was at the location on October 11, 2022, the day of Marin's alleged accident.   Urban's Director of Operations, Lawrence Attia, was present at the site on October 11, 2022, for a meeting with representatives of the building's owner, but no workers worked at the location that day.

206.   **Defendant Marin never worked for Urban**.  He visited the subject location on October 11, 2022, to merely stage an accident and injuries resulting therefrom.

207.   The "accident" was witnessed by Attia, who was present at the location on the day Marin alleged the accident occurred.  Attia observed Marin walk down the stairs and to the ground floor, kneel on his right knee, and carefully lay down on his back.

208.   Marin was taken by ambulance to a local hospital where a series of diagnostic tests were taken, after which he was discharged within a matter of hours without any significant clinical medical finding of injury.

209.   Upon information and belief, despite being discharged without any significant clinical medical finding of disability, Marin's attorneys referred him to medical

providers that falsely opined on injuries where none existed or were unrelated to his alleged work site accident, and falsely inflated his fraudulent claim for damages.

210.    On January 19, 2023, approximately two months after the alleged accident, Marin and the Subin Firm electronically filed his personal injury lawsuit in New York County Supreme Court captioned *Erwin Marcel-Guaringo-Marin v. Spring Scaffolding LLC and DaPaul Realty Holdings LLC* under Index No. 150589/2023. Marin was represented by the Subin Firm until April 3, 2024, when the Subin Firm was substituted as counsel.

211.    Contrary to Marin's allegations regarding the alleged injuries, based on his medical and workers' compensation records, many of his injuries did not exist and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

212.    Medical Providers, for themselves and on behalf of Marin, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Marin, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

213.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Providers.

214.    The Subin Firm, provided by mail or by electronic service to the New York County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Marin's injuries, the existence of and

the extent of Marin's injuries, and the necessity of medical treatment that Marin received in connection with the alleged workplace accident, in order to falsely bolster and add value to Marin's personal injury lawsuit, thereby inflating settlement value and ultimately, Defendants' financial gain from Marin's personal injury lawsuit.

**Staged Accident #11 – Milton Marin – November 30, 2022**

215.    Upon information and belief, Blustone Contracting LLC was a general contractor hired to perform construction related work at 828 New York Avenue in the County of Kings, City, and State of New York.

216.    Bluestone Contracting LLC subcontracted with SHH Management Inc., Milton Marin's employer, to perform construction related work at 828 New York Avenue.

217.     Milton Marin began working for SHH Management Inc. at 828 New York Avenue on or about no earlier than November 1, 2022.

218.    On or about November 30, 2022, after he had been working at 828 New York Avenue for less than one month, Milton Marin staged his accident claiming injuries resulting therefrom.

219.    Upon information and belief, the accident was unwitnessed despite other personnel being present.

220.    Milton Marin was taken by ambulance to a local hospital at which a series of diagnostic tests were taken, after which he was discharged within a matter of hours without any significant clinical medical finding of injury.

221.    Upon information and belief, despite being discharged without any significant clinical medical finding of disability, Milton Marin's attorneys referred him to medical

providers that falsely opined on injuries where none existed or were unrelated to his alleged fall, and falsely inflated his fraudulent claim for damages.

222.    On January 13, 2023, Milton Marin electronically filed a personal injury lawsuit in Queens County Supreme Court captioned *Milton J. Guarango Marin v. 828 NY Realty Group LLC et al.* under Index No. 700829/2023.

223.    Contrary to Milton Marin's allegations regarding the alleged injuries, based on his medical and workers' compensation records, many of his injuries did not exist and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

224.    Medical Providers, for themselves and on behalf of Milton Marin, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Milton Marin, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

225.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Providers.

**Staged Accident #12 - Clavijos Fajardo – July 17, 2023**

226.    Skyline is named insured under the Ionian and Liberty Mutual policies and is the general contractor hired by the Puck Building to perform construction-related work at 295 Lafayette Street in the County, City and State of New York.

227.    Skyline subcontracted with Clavijos Fajardo's employer, OLJ Services ("OLJ"), to perform construction-related work at 295 Lafayette Street.

228.    Skyline started working at 295 Lafayette Street on or about October 2022, and was present on July 17, 2023, the day of Clavijos Fajardo's staged accident.

229.    Defendant Clavijos Fajardo began working for OLJ at 295 Lafayette Street on or about July 15, 2023, just two days before the accident.

230.    Clavijos Fajardo claimed he sustained injuries resulting from an accident while working on the façade of the building at 295 Lafayette, along the second-floor platform of the west-side elevated scaffold.  He claims to have fallen through a hole along the platform about five feet to the platform below.

231.    Clavijos Fajardo himself created the hole by removing the wooden planks of the platform (without authorization) shortly before his accident and purposely failed to safely tie off to the pipe scaffold as instructed by his foreman.

232.    The accident was witnessed by other personnel present at the location.

233.    Clavijos Fajardo was taken by ambulance to a local hospital at which a series of diagnostic tests were taken, after which, he was discharged within a matter of hours without any significant clinical medical finding of injury.

234.    Upon information and belief, despite being discharged without any significant clinical medical finding of disability, Clavijos Fajardo's attorneys referred him to medical providers that falsely opined on injuries where none existed or were unrelated to his alleged fall, and falsely inflated his fraudulent claim for damages.

235.   On August 1, 2023, Clavijos Fajardo electronically filed a complaint in New York County Supreme Court captioned *Johnny Geovanny Clavijos Fajardo v. New Puck LLP* under Index No. 157626/2023.

236.   Thereafter, on or about August 8, 2023, Clavijos Fajardo electronically filed and/or sent, or caused to be sent, by mail a workers' compensation claim made under the penalty of perjury that falsely claiming a series of injuries caused by his staged accident.

237.   Contrary to Clavijos Fajardo's allegations regarding the alleged injuries, based on his medical and workers' compensation records, many of his injuries did not exist and/or were not related to the alleged workplace accident, and the medical services provided were unnecessary, excessive and/or unwarranted and were not causally related to the alleged accident.

238.   Medical Providers, for themselves and on behalf of Clavijos Fajardo, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Clavijos Fajardo, which were unnecessary, excessive, unwarranted, and/or costly and were not causally related to the alleged workplace accident.

239.   Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Providers.

**C.    Defendants' Participation in the Fraud Scheme**

240.   At all relevant times, the Defendants constituted one or more association-in-fact enterprises that were/are engaged in, and the activities of which affected, interstate commerce.  Each of the Defendants participated in the operation or management of the enterprise(s).

i.    <u>Runner-Claimant Defendants' Participation in the Fraud Scheme</u>

241.    Since at least 2017, the Runner-Claimant Defendants have been involved in the claims described above purporting construction work accidents and injuries, covered by various insurers, reinsurers, including Ionian, and general contractors and subcontractors, including Skyline, Urban and DNA Contracting & Waterproofing, all in furtherance of the Fraud Scheme.

Each of the Runner-Claimant Defendants are either family related or knew each other through personal friendships and/or working affiliations.  These relationships provided the conduit for such defendants to communicate, plan, and engage with each other and the Plaintiff Law Firms in a scheme to defraud construction companies, their insurers, and State of New York by staging accidents at various construction sites.  The relationships among the Runner-Claimant Defendants are depicted as follows:

**Figure 2.**



A fuller version of this chart is attached hereto as **Exhibit "A"**.

242.    The relationships among the Runner-Claimants as depicted by Figure 2 are as follows:

**Barrezueta-Montesdeoca**

Upon information and belief, Leidy Orellana and Wilson Barrezueta are the parents of defendant Barrezueta.

Upon further information and belief, Leidy Orellana and defendant Montesdeoca are parents to a child named Paulina, making Montesdeoca the father of a half-sibling to defendant Barrezueta.

**<u>Bravo – Carlos Figueroa-Orellana – Barrezueta</u>**

Upon information and belief, Bravo, Barrezueta, and Carlos Figueroa-Orellana are cousins. Their mothers, Cecibel Orellana, Leidy Orellana, and Rosa Orellana, are sisters.

**<u>Barrezueta – Wilson Barrezueta</u>**

Wilson Barrezueta is  Barrezueta's father.

**<u>Bravo - Fajardo</u>**

Upon information and belief, William Fajardo and Monica Landivar are the parents of defendant Fajardo.

Upon further information and belief, Fajardo's mother, Monica Landivar Narvaez, has a child with defendant Bravo making Fajardo a half sibling to Bravo's child.

Bravo is also the brother-in-law of Willie Fajardo, who is married to Bravo's sister Lorena.

**<u>Fajardo-Barrezueta</u>**

Upon information and belief, Defendants Fajardo and Barrezueta and non-defendant Carlos Figueroa Orellana are close friends who socialize together as shown by the fact, among other things, that they were driving in the same vehicle and involved in a motor vehicle accident on February 18, 2022.

**<u>Fajardo - Tzay</u>**

Upon information and belief, Fajardo's mother Monica Landivar's sister, Fatima Landivar Narvaez's husband is defendant Tzay's brother.

**<u>Bravo- Fajardo-Montesdeoca-Tzay</u>**

Defendants Bravo, Fajardo, Tzay, and Montesdeoca all obtained their OSHA cards from the same instructor, Anthony Kelvion Molina. Montesdeoca's and Bravo's cards share the same issue date of October 6, 2021.

**<u>Bravo/Fajardo - Clavijos Fajardo</u>**

Upon information and belief, Bravo's sister Lorena Bravo and brother-in-law Willie Fajardo are godparents to Clavijos Fajardo's daughter.

### Barrezueta – Erwin Marin – Milton Marin

Upon information and belief, Marin has known Barrezueta since he was a child, as reflected in social media postings on Marin's Facebook page. This page contained two pictures of Barrezueta with a caption indicating the pictures were of Barrezueta when he was young.

### Barrezueta – Patricio and Rosario Cedillo – Carlos Figueroa-Orellana

Upon information and belief, Barrezueta's cousin Carlos Figueroa-Orellana was a co-worker and friend of Defendants Rosario Cedillo and Patricio Cedillo. All three worked together at the Nautilus located at 2790 Bragg Street in the County of Brooklyn, City and State of New York.

243.    The Defendants' connection also manifests in specific acts supporting the Fraud Scheme. For example, Barrezueta's fake home address of 102-2 Martense Avenue is the same fake address he lists for his emergency contact, Carlos Figueroa Orellana. Defendant Bravo also lists the same address for his emergency contact, Oscar Calle ("Calle") who had a personal injury lawsuit against Skyline back in 2014.

244.    Calle is also linked on background checks to 3806 11th Street, Corona Queens, an address that has incredibly recorded since 2017 approximately 61 insurance claims from 34 separate individuals who have reported this two-family structure as their residence. This includes Patricio Cedillo, who is a defendant in this lawsuit.

245.    Upon information and belief, the Runner-Claimant Defendants engaged in the Fraud Scheme using multiple Plaintiff Law Firms who they knew would be agreeable to pursuing their fraudulent claims and those that helped recruit. Upon further information and belief, the Runner-Claimant Defendants did so to conceal the nature of their relationships amongst each other and to prevent or reduce the risk of detection of their enterprise and engagement in the Fraud Scheme.

246.    Upon information and belief, the Runner-Claimant Defendants communicated with each other, other Claimants and the Plaintiff Law Firms through telephone calls, texts, emails and U.S. mail.

247.    The Runner-Claimants Defendants engaged in numerous acts in furtherance of the Fraud Scheme.  Among other things, the Runner-Claimant Defendants referred each other and/or transported themselves and other Claimants to the Plaintiff Law Firms so that they could retain the Plaintiff Law Firms to a) direct Claimants' medical treatment from medical providers; b) direct Claimants to obtain high-interest funding loans from litigation funding companies; c) direct, authorize, coordinate and control the prosecution of Claimants' personal injury lawsuit; and d) refer Claimants for representation and prosecution of the Claimants' workers' compensation claims.

248.    Further, upon information and belief, the Runner-Claimant Defendants participated in meetings among themselves, other Claimants and the Plaintiff Law Firms in furtherance of the Fraud Scheme.

249.    The Runner-Claimant Defendants not only receive a portion of the proceeds from high-interest funding loans provided by litigation funding companies, but also fees for the referral of other Claimants to the Plaintiff Law Firms and directly from the proceeds relating to their own claims.

250.    At all times relevant, the Runner-Claimant Defendant in coordination with the Plaintiff Law Firms consented and participated in (i) facilitating transport and attending medical visits for themselves and other Claimants; and, (ii) submitted to unnecessary treatment they did not need.  Furthermore, the Runner-Claimant Defendants knowingly allowed, encouraged and consented to the transmission of documents by mail and/or

email which contained assertions of legitimate construction accidents, the existence of injuries and the necessity of medical treatment. This unlawful conduct worked to falsely bolster and add value to the Runner-Claimant Defendants' workers' compensation claims and personal injury lawsuits, thereby inflating their own settlements.

ii.    Subin Defendants' Participation in the Fraud Scheme

251.    Since at least 2019, the Subin Firm has been involved in thousands of lawsuits with attendant workers' compensation proceedings involving purported construction work injuries in furtherance of the Fraud Scheme.

252.    Defendants H. Subin and E. Subin, uncle and nephew, are partners at the Subin Firm, which boasts three generations of the Subin family on the cutting edge of personal injury law.

253.    At all times relevant the Subin Defendants directed, authorized, coordinated, and controlled the conduct engaged in by the Runner-Claimant Defendants to recruit construction workers (*i.e.*, Claimants) to stage workplace accidents and/or falsely claim injuries unrelated to the alleged accidents.

254.    At all times relevant, the Subin Defendants represented Claimants, including the Runner-Claimant Defendants, in personal injury lawsuits, including six herein. They directed, authorized, coordinated, and controlled the prosecution of Claimants' lawsuits, assigning duties and responsibilities to attorneys/employees of the Subin Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and medical documentation to various courts within the State of New York and all named parties in the personal injury lawsuit.

255.    As part of the Fraud Scheme, the Subin Defendants referred Claimants to workers' compensation attorneys for representation and prosecution of the Claimants' workers' compensation claims.

256.    The Subin Defendants directed Claimants, including the Runner-Claimant Defendants, to seek medical treatment from Medical Providers knowing and understanding that the Medical Providers would provide false and misleading medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the medical providers.

257.    The Subin Defendants directed Claimants to obtain high-interest funding loans from litigation funding companies secured by settlement payments anticipated from Claimants' workers' compensation claims and/or personal injury lawsuits.

258.    The Subin Defendants received a portion of the proceeds from the high-interest funding loans provided by the litigation funding companies.

259.    The Subin Defendants knowingly transmitted and received by U.S. mail, facsimile, email, internet or wire communication documents that contained assertions of legitimate construction accidents, the existence of injuries, and the necessity of medical treatment that the Subin Defendants knew or reasonably should have known were false.

260.    This unlawful conduct worked to falsely add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating settlement value and ultimately, Subin Defendants' financial gain from the lawsuits.

   iii.      <u>Wingate Defendants' Participation in the Fraud Scheme</u>

261.    Since at least 2017, the Wingate Firm has been involved in thousands of lawsuits, the majority of which involved purported construction work injuries with attendant

workers' compensation proceedings involving purported construction work injuries in furtherance of the Fraud Scheme.

262.   Defendants Russotti, Shapiro, Moses and Halperin are the named partners of the Wingate Firm.

263.   At all times relevant, the Wingate Defendants directed, authorized, coordinated, and controlled the conduct engaged in by the Runner-Claimants to recruit construction workers (*i.e.*, Claimants) to stage workplace accidents and/or falsely claim injuries unrelated to the alleged accidents.

264.   At all times relevant, the Wingate Defendants represented Claimants, including the Runner-Claimant Defendants, in personal injury lawsuits, including two herein.  They directed, authorized, coordinated, and controlled the prosecution of Claimants' lawsuits, assigning duties and responsibilities to attorneys/employees of Wingate Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and medical documentation to various courts within the State of New York and all named parties in the personal injury lawsuit.

265.   As part of the Fraud Scheme, the Wingate Defendants referred Claimants to workers' compensation attorneys for representation and prosecution of the Claimants' workers' compensation claims.

266.   The Wingate Defendants directed the Claimants, including the Runner-Claimant Defendants, to seek medical treatment from Medical Providers knowing and understanding that the Medical Providers would provide the kind of false and misleading medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the medical providers.

267.   The Wingate Defendants directed Claimants to obtain high-interest funding loans from litigation funding companies secured by settlement payments anticipated from Claimants' workers' compensation claims and/or personal injury lawsuits.

268.   The Wingate Defendants received a portion of the proceeds from the high-interest funding loans provided by the litigation funding companies.

269.   The Wingate Defendants knowingly transmitted and received by U.S. mail, facsimile, email, internet or other wire communication documents that contained assertions of legitimate construction accidents, the existence of injuries, and the necessity of medical treatment that the Wingate Defendants knew or reasonably should have known were false.

270.   This unlawful conduct worked to falsely add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating settlement value and ultimately, Wingate Defendants' financial gain from the lawsuits.

   iv.    Schwitzer Defendants' Participation in the Fraud Scheme

271.   Since at least 2021, the Schwitzer Firm has been involved in thousands of lawsuits, the majority of which involved purported construction work injuries with attendant workers' compensation proceedings involving purported construction work injuries in furtherance of the Fraud Scheme.

272.   Defendant Schwitzer is the founding and senior partner of the Schwitzer Firm.

273.   At all times relevant, the Schwitzer Defendants directed, authorized, coordinated, and controlled the conduct engaged in by the Runner-Claimants to recruit construction workers (*i.e.*, Claimants) to stage workplace accidents and/or falsely claim injuries unrelated to the alleged accidents.

274. At all times relevant, the Schwitzer Defendants represented Claimants, including the Runner-Claimant Defendants, in personal injury lawsuits, including two herein. They directed, authorized, coordinated, and controlled the prosecution of Claimants' lawsuits, assigning duties and responsibilities to attorneys/employees of the Schwitzer Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and medical documentation to various courts within the State of New York and all named parties in the personal injury lawsuit.

275. As part of the Fraud Scheme, the Wingate Defendants referred Claimants to workers' compensation attorneys for representation and prosecution of the Claimants' workers' compensation claims.

276. The Schwitzer Defendants directed the Claimants, including the Runner-Claimant Defendants, to seek medical treatment from Medical Providers knowing and understanding that the Medical Providers would provide the kind of false and misleading medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the medical providers.

277. The Schwitzer Defendants directed Claimants to obtain high-interest funding loans from litigation funding companies secured by settlement payments anticipated from Claimants' workers' compensation claims and/or personal injury lawsuits.

278. The Schwitzer Defendants received a portion of the proceeds from the high-interest funding loans provided by the litigation funding companies.

279. The Schwitzer Defendants knowingly transmitted and received by U.S. mail, facsimile, email, internet or other wire communication documents that contained assertions of legitimate construction accidents, the existence of injuries, and the

necessity of medical treatment that the Schwitzer Defendants knew or reasonably should have known were false.

280.    This unlawful conduct worked to falsely add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating settlement value and ultimately, Schwitzer Defendants' financial gain from the lawsuits.

**D.    Defendants' Pattern of Racketeering Activity**

281.    The pattern of racketeering engaged in by Defendants involving a scheme to defraud and steal from Plaintiffs and others began on or about 2017, and continues to the present day, and includes, among others, those set forth hereinabove and in the Pattern of Racketeering Activity – Predicate Acts attached hereto as **Exhibit "B"**.

**IV.    PLAINTIFFS' JUSTIFIABLE RELIANCE**

282.    The Plaintiffs had contractual obligations to pay deductibles and/or claims-related expenses promptly and fairly in connection with the claims made the basis of this lawsuit and others.

283.    The invoices and documentation supporting the Fraud Scheme submitted to Plaintiffs, either directly or indirectly, the New York State Workers' Compensation Board, the New York Unified Court System, and others contained materially false statements and were designed to mislead and conceal materially false statements. The Defendants submissions presented the claims as legitimate accidents and injuries requiring treatment when, in fact, they were not.

284.    As such, Plaintiffs justifiably and reasonably relied on them as facially valid incurring damages to their business and property as a result.

## V.    DAMAGES

285.    Plaintiff Ionian is a reinsurer which underwrites policies and provides covering personal injury lawsuits filed and prosecuted by the Defendants as part of the Fraud Scheme. As such, Ionian is a party directly and ultimately damaged by the Fraud Scheme.

286.    Due to Defendants' perpetration of the Fraud Scheme, Ionian has incurred expenses paid as reimbursement to primary insurers providing coverage for the lawsuits filed and/or prosecuted by the Defendants.

287.    But for Defendants' perpetration of the Fraud Scheme, Ionian's expenses paid as reimbursement to primary insurers would be less and arguably non-existent because the injuries, if any, would be less severe and the medical services necessary to treat any accident-related injury, if any, would be less significant, resulting in lower settlement value of such lawsuits and thus, less litigation expenses.

288.    Due to Defendants' perpetration of the Fraud Scheme, Ionian has incurred general liability claim adjustment expenses progressively rising from $3,150,000 in 2018 to $5,150,000 in 2019 (63.49% increase from 2018), to $6,150,000 in 2020 (19.42% increase from 2019), to $14,250,000 in 2021 (131.71% increase from 2020), to $16,250,000 in 2022 (14.04% increase from 2021), to $18,400,000 in 2023 (13.23% increase from 2022).  This represents a 484% increase in effectively the three years after the COVID - 19 pandemic during 2020, which led to the single largest one-year decline for the construction industry in New York City since 1990.  *See* Office of the New York State Comptroller, "The Construction Industry in New York City: Recent Trends   and   Impact   of   COVID-19,"   March   3,   2022,   at   3.   *See*

https://www.osc.ny.gov/files/reports/osdc/pdf/report-3-2021.pdf, incorporated herein by reference, last accessed February 15, 2024.

289.    Further, during the period of 2021, 2022 and 2023, Ionian's net outstanding liability under general liability increased from $7,150,000.00 to $33,125,000 to $58,750,000 respectively, an increase of nearly 722%.

290.    The drastically escalating cost of construction-related claims in general liability areas stands in marked contrast to the overall decreasing number of workplace injuries, which in New York City reportedly decreased from 759 in 2018 to 554 in 2022 (a 27% decrease). *See e.g.*, "2022 New York City Construction Safety Report," at https://www.nyc.gov/assets/buildings/pdf/con_safe_2022.pdf, incorporated herein by reference, last accessed February 15, 2024. The number of workplace incidents decreased from 1,193 in 2018 to 751 in 2022, a 37% decrease. *Id.*

291.    In an April 2024 study, the New York Civil Justice Institute indicated that insurance costs in New York are higher than any other state and that insurance professionals warn that the market is headed toward a crisis that will have long term implications for consumers." *See https://acrobat.adobe.com/id/urn:aaid:sc:us:2de7b5f8-2913-4ed4-8ec4-625d1ca07466,* incorporated herein by reference, last accesses August 5, 2024.

292.    The study goes on to say that construction insurance costs are the highest when compared to nearby states such as Connecticut, New Jersey and Pennsylvania at a rate of 12.5% of a project's costs versus 2.5%, respectively. *Id.*

293.    Further, the study cites information that an average Labor Law 240(1) claim will settle for above $1 million, however, if there is a neck or back surgery involved, the claim value averages between $2 million to $3 million or more.  *Id.*

294.    In the face of fraudulent insurance claims, much like the defendants' Fraud Scheme, the New York Legislature has introduced a bill making the staging of a construction accident and the encouraging and assisting the same, a Class E Felony in the State of New York.  That bill is currently pending.

295.    Plaintiffs Skyline, Urban and DNA Contracting & Waterproofing are all contractors operating on construction sites in and around New York City.  They are required to maintain insurance coverage for the work to perform, which requires the payment of premiums to bind the policies and deductible expenses for claims asserted against the same.

296.    Skyline, Urban and DNA Contracting & Waterproofing each have made substantial deductible payments for the fraudulent claims made against their policies and sustained significant damage in connection with the increase in insurance premiums directly related to the increase in the number of such fraudulent claims.  The increase is due to the various claims and lawsuits filed and prosecuted by the Defendants as part of the Fraud Scheme.

297.    Defendants' patterns of fraudulent conduct caused injury to Plaintiffs in their business and property by reason of the aforesaid violations of state and federal law.  Although it is not necessary for Plaintiffs to calculate damages with specificity at this stage in the litigation (whereas Plaintiff's damages continue to accrue), Plaintiffs' injuries include, but are not limited to the following:

   a.    Plaintiff Ionian - Actual and consequential damages for the payments such Plaintiff made as reimbursement for payments made directly to the Defendants or to others due to Defendants' pattern of fraudulent conduct in

connection with claims made under New York's Labor Laws, the exact amount to be determined at trial.

b.    Plaintiffs Skyline, Urban and DNA Contracting & Waterproofing – Actual and consequential damages for the deductible expenses and increased premiums incurred due to Defendants' pattern of fraudulent conduct in connection with the Fraud Scheme, the exact amount to be determined at trial.

## VI.    CAUSES OF ACTION

### COUNT I

### RICO Violation (§ 1962(c))

### (Against All Defendants)

298.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

299.    At all times relevant herein, Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce. Each of the Defendants participated in the operation or management of the enterprise where each Defendant maintained a specific role that was essential to the operation of the scheme and for the common purpose of all Defendants.

300.    In addition to any legitimate transactions, the course of conduct of this enterprise included a pattern of racketeering activity carried out by Defendants. *See* supra; *see also* Exhibit A (RICO Predicate Acts List).

301.    Each of the Defendants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

302.    The pattern of racketeering activity in which the Defendants engaged involved numerous specific acts and conducts as described in detail in this Complaint and the accompanying exhibit, constituting mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

303.    The predicate acts of mail fraud and wire fraud involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers' compensation claims and personal injury lawsuits arising out of fraudulent construction accidents.

304.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

a.    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.    Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

c.    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

d.    Such other relief as the Court deems just and proper.

## COUNT II

## RICO Violation (§ 1962(d))

## (Against All Defendants)

305.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

306.    From at least 2017 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

307.    The pattern of racketeering activity in which the Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts and conducts as described in detail in this Complaint and the accompanying exhibit, constituting mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343)– all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

308.    The predicate acts of mail fraud and wire fraud also involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers' compensation claims and personal injury lawsuits arising out of fraudulent construction accidents.

309.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

a.      An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.      Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

c.      Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

d.      Such other relief as the Court deems just and proper.

## COUNT III
## Common Law Fraud
## (Against All Defendants)

310.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

311.    The Defendants made misrepresentations of facts, deliberately concealed, omitted materials facts that they had a duty to disclose in connection with their claims for reimbursement and/or payment under New York law.

312.    These misrepresentations of fact by the Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence of injuries and the necessity of treatment.

313.    The Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

314.    The Defendants made these misrepresentations in furtherance of the scheme to defraud Plaintiffs by submitting claims for payment of workers' compensation and general liability insurance benefits.

315.    The Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiffs to make payments for claims that were not legitimate.

316.    Plaintiffs reasonably and justifiably relied, to their detriment, on the truthfulness of the Defendants' representations concerning their eligibility to receive payments of workers' compensation and general liability insurance benefits, and without knowledge of the Defendants' scheme and artifice to defraud them.

317.    The Defendants knew, or should have known, that Plaintiffs would rely on and intended that they so rely on their truthfulness.

318.    But for the Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiffs would not have paid insurance benefits and would not have incurred expenses related to the administration of and defense against such claims.

319.    Plaintiffs at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Defendants were engaged in misrepresentations, omissions, and fraudulent conduct.

320.    As a direct and proximate cause of the Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Defendants, Plaintiffs have been damaged.  Plaintiffs' damages include, but are not necessarily limited to, benefit payments, administration costs, investigative and defense costs paid by Plaintiffs to the Defendants or caused by the Defendants.

321.    Because the Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiffs are entitled to an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

a.    An award of Plaintiffs' actual and consequential damages to be established at trial;

b.    Plaintiffs' costs, including, but not limited to, investigative costs incurred in the detection of the Count III Defendant's illegal conduct; and

c.    Such other relief as the Court deems just and proper.

## COUNT IV
## Unjust Enrichment
## (Against All Defendants)

322.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

323.    As described above, the Defendants conspired to induce Plaintiffs to make or expend numerous and substantial payments to them or others.

324.    The Defendants were never eligible to make claims or seek reimbursement under New York law because, at all relevant times, the accidents, injuries and treatment were fraudulent.

325.    When Plaintiffs paid the Defendants and others, Plaintiffs reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Defendants, or those persons working under their control, made concerning the Defendants' eligibility to make claims or seek reimbursement under New York law.

326.    Each and every payment that Plaintiffs made or was caused to make to the Defendants and others during the course of the Fraud Scheme constitutes a benefit that the Defendants sought and voluntarily accepted.

327.    Throughout the course of their scheme, the Defendants wrongfully obtained from Plaintiffs benefit payments as a direct and proximate result of the unlawful conduct detailed above.

328.    Retention of those benefits by the Defendants would violate fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

    a.    An award of Plaintiffs' actual and consequential damages to be established at trial; and

    b.    Such other relief as the Court deems just and proper.

### COUNT V
### Declaratory Relief Pursuant to 28 U.S.C. § 2201
### (Against All Defendants)

329.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

330.    Pursuant to 18 U.S.C. § 2201(a), the Court may determine the rights and legal obligations of the parties.

331.    There is an actual case and controversy between Plaintiffs on the one hand, and the Defendants on the other hand, as to all charges for examinations, treatments, testing, injections, surgeries, and physical therapy that have not been paid to date and through the pendency of this litigation. Plaintiffs contend these Defendants are not entitled to reimbursement for any of these charges.

332.    Because these Defendants have made false and fraudulent statements and otherwise engaged in the fraudulent conduct described above with the intent to conceal, mislead and

misrepresent material facts and circumstances regarding each claim submitted, these Defendants are not entitled to any reimbursement for alleged services relating to any of the claims at issue.

WHEREFORE, Plaintiffs demand judgment against the Defendants for:

    a.    A declaration that the Defendants, at all times relevant, have submitted claims and bills to Plaintiffs for staged accidents and unnecessary healthcare services in violation of New York law;

    b.    Declare that the Defendants' activities are unlawful;

    c.    Declare that Plaintiffs have no obligation to pay any pending, previously-denied, and/or future insurance claims submitted by or caused by the Defendants; and

    d.    Such other relief as the Court deems just and proper.

## VII.    JURY TRIAL DEMAND

333.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims.

Dated: November 15, 2024
\

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**

By: */s/ William J. Clay*
**WILLIAM J. CLAY** *(admission pro hac pending)*
**MICHAEL A. GRAVES**
**AARON E. MEYER**
**KIRK D. WILLIS** *(admission pro hac pending)*
1985 Forest Lane
Garland, Texas 75042
Telephone:  214-736-9433
Facsimile:  214-736-9994
Service Email: service@thewillislawgroup.com

***ATTORNEYS FOR THE PLAINTIFFS***
**IONIAN RE, LLC, SKYLINE RESTORATION
INC., URBAN D.C. INC. and DNA
CONTRACTING & WATERPROOFING LLC**